VAN VLECK TURNER & ZALLER LLP
    Brian F. Van Vleck, State Bar No. 155250
    bvanvleck@vtzlaw.com
    Anthony J. Zaller, State Bar No. 224844
    azaller@vtzlaw.com
555 West Fifth Street
31st Floor
Los Angeles, California 90013
Telephone:  (213) 996-8445
Facsimile:  (213) 996-8378

Attorneys for Named Plaintiffs
JEREMY J. DRAKE and ADAM SCOTT

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMY J. DRAKE AND ADAM SCOTT, on behalf of themselves and others similarly situated,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>MORGAN STANLEY & COMPANY, INC., MORGAN STANLEY DW, INC., and DOES 1 through 100 inclusive,<br><br>                    Defendants. | CASE NO: CV 09-6467 ODW (RCx)<br><br>**CLASS ACTION**<br><br>**NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>DATE:  April 26, 2010<br>TIME:   1:30 p.m.<br>CTRM:  26<br><br>Action Filed:  July 30, 2009<br>Trial Date:     None Set |

TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that: on April 26, 2010, at 1:30 p.m., or as soon thereafter as the matter may be heard in Courtroom 26 of the above-entitled Court, located at 312 North Spring Street, Los Angeles, California, named Plaintiffs Jeremy J. Drake and Adam B. Scott ("Plaintiffs") will, and hereby do, move for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure.

This motion is made following conference of counsel pursuant to Local Rule 7-3, on January 28 and February 4, 2010.

Plaintiffs seek certification pursuant to Rule 23(b)(2) and/or Rule 23(b)(3) as to each of the following classes or subclasses (collectively, the "Class") of similarly situated employees.

Class No. 1 (Expense Reimbursement Class):  All employees of Defendant in California who held the position of Financial Advisor after February 16, 2006 (the "Class Period").  The members of the Expense Reimbursement Class are seeking remedies, including restitution, disgorgement, penalties and equitable relief, under California Business and Professions Code Section 17200, et seq., and California Labor Code Sections 221-223, 2802, and 2699, subds (a) and (f).

Class No. 2 (Overtime Class):   All employees of Defendant in California who held the position of Financial Advisor after February 16, 2006 (the "Class Period"). The members of the Overtime Class are seeking remedies, including restitution, disgorgement, penalties and equitable relief, under California Business and Professions Code Section 17200, et seq., and California Labor Code Sections 1194 and 2699, subd. (a) and (f).

Class No. 3 (Restraint of Trade Class):    All employees of Defendant in California who held the position of Financial Advisor after February 16, 2006 (the "Class Period"), who executed a "Financial Advisor Employment Agreement" and/or "Acknowledgement of Promissory Note."  The members of the Restraint of Trade Class are seeking a declaratory relief to prevent the enforcement of the non-

competition and acceleration provisions of these agreements remedies, including restitution, disgorgement, penalties and equitable relief, under California Business and Professions Code Section 17200, et seq., and California Labor Code Sections 1194 and 2699, subd. (a) and (f).

In the alternative, Plaintiff is moving for partial certification of such issues or claims as the Court may deem appropriate for class treatment pursuant to Federal Rule of Civil Procedure Rule 23(c)(4).

Plaintiffs further request that their present counsel of record, Van Vleck Turner & Zaller, LLP, be appointed as Class Counsel.

This motion is based on the Notice of Motion and Motion, the Memorandum of Points and Authorities, the declarations of Jeremy J. Drake, Adam B. Scott and Brian F. Van Vleck, the entire record in this action, and such other evidence or argument that may be presented to the Court prior to or at the hearing of this motion.

Dated:  February 15, 2010        VAN VLECK TURNER & ZALLER, LLP
                                 Brian Van Vleck
                                 Anthony J. Zaller


                                 By: _____/s/_____
                                             Brian F. Van Vleck
                                 Attorneys for Named Plaintiffs
                                 Jeremy J. Drake and Adam Scott

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION

Morgan Stanley ("Morgan") requires its Financial Advisors ("FAs") to fund its operating costs out of their own pockets.  It does this by imposing a patently inadequate "expense allowance," which is frequently zero.  Morgan knows its FAs are funding its business by personally paying for travel, postage, and even compensation for assistant staff.   Under California law "an employer may not 'pass through' the normal costs of operating a business to the employee he hires."[1] Plaintiffs are entitled to seek restitution and disgorgement of the unreimbursed costs wrongfully withheld and/or charged back to the class.

Morgan also has a blanket policy that the FA position, and everyone holding that job title, is ineligible for overtime pay.  This corporate policy was made with no analysis of whether the position's duties or compensation actually meet any California overtime exemption.   Having denied overtime to the entire class based on job title alone, Morgan now asserts no class can be certified because overtime eligibility can supposedly be determined only on an "individualized" basis.

But this is wrong.  It is Morgan's burden to prove each element of its three overtime defenses – i.e., the "Professional," "Administrative," and "Commissioned Sales" exemptions.  And Plaintiffs are not required to prove that every single class member was misclassified in every pay period.  Rather, a finding of class-wide liability is proper if Morgan's "classification based on job descriptions alone [has] resulted in widespread de facto misclassification."[2]  Each of Plaintiff's theories can prove widespread misclassification by resolving common legal and factual issues.

For example, the Administrative and Professional exemptions require the payment of a minimum salary.  But Morgan's compensation scheme for the entire

---

[1] Compendium of Evid., ("Comp.") at Exh. I, August 1, 2000 DLSE Opinion Letter at p. 4.
[2] *Sav-On Drug Stores, Inc. v. Superior Court*, 34 Cal.4th 319, 329 (2004).

FA position failed to guaranteed this minimum salary "free and clear" of offsets and deductions, thereby preventing it from claiming either exemption for the position.

The Professional exemption also cannot apply because the position requires no advanced degree or training.  The Administrative exemption fails because, by its very nature, the FA position performs a front-line sales and client service function with no authority over the administration of Morgan's internal operations.  The Commissioned Sales exemption fails, as a matter of law, because FAs perform client service work themselves rather than selling the services of others.

For purposes of the present procedural motion, the Court need not (and should not) decide the merits of these various contentions.  It is clear, however, that Plaintiffs are entitled under Rule 23 to assert these theories of recovery on behalf of the proposed Class.

## II.  BACKGROUND FACTS

## A.      THE NATURE OF THE FINANCIAL ADVISOR POSITION

Approximately 2,000 FAs have been employed in California during the Class Period, working for Morgan's individual investor "retail" division, Global Wealth Management. [3]  According to its website this retail operation provides "customized investment solutions and services for individuals of substantial means, families and foundations." [4]  Morgan provides "Institutional Services" for "companies, governments and institutional investors" through a separate program.[5]

According to a description given to applicants, FAs are trained to "Build a client base of high net worth individuals."   They require a "Demonstrated ability to sell" and, while a college degree is preferred, it is "not required for candidates with

---

[3] Answer to Drake Interrogatory No. 1, Comp. Exh. Y; Benner Dep. at 14:9-22, Exh. AA.
[4] Comp., Exh. K.
[5] Comp. Exh. L.

more than 5 years of sales experience." [6]   According to another internal description of the "Financial Advisor Platform," Morgan is looking for individuals who have "networking skills" and "no call reluctance."  "Key work activities" for the position include "contacting prospective clients (by telephone, networking, seminars, etc.)," "gathering information from clients," and "conducting client appointments." [7]

FAs spend a substantial amount of time engaged in activities like cold calling, networking, generating prospects and introductions, and the like.  Morgan claims this is not "selling," however, and that "Morgan Stanley looks at it as providing financial solutions for their clients."[8]

In any event, once a client is landed, FAs follow a five-step protocol for servicing the account.  In a document published to clients under the heading "Working with Your Financial Advisor," Morgan explains that "because we recognize every client is unique, we approach each relationship through these five steps."[9]

The first step ("Understanding you"), is to obtain the client's "goals and risk tolerance."   To do this, the FA merely asks the client to rank his order of preference as between "Growth," "Income," "Aggressive Growth," and "Speculation." [10]   The FAs are trained to describe these terms in a prescribed manner.[11]

The second step ("Analyzing your needs"), is to "review and analyze your current financial situation."  In this regard, Morgan requires the FA to collect and input specific fields of information when opening an account, including the client's age, net worth, income, liquid assets, marital status, etc.

The third step ("Tailoring the solution"), is to recommend an "appropriate

---

[6] Financial Advisor – Position Summary, Exh. N; Benner Dep., Exh AA, at 222;21-223:14
[7] Financial Advisor Platform, Exh. O; Benner Dep., Exh. AA, at 217:19-220.
[8] Benner Dep., Exh. AA, at 145:18-146:18.
[9] "Working with Your Financial Advisor," Exh. M.
[10] Benner Dep., Exh. AA, at 159:22-167:23.
[11] Benner Dep., Exh. AA, at 167:19-23.

Van Vleck
Turner & Zaller, LLP

Case No. CV 09-6467
PLAINTIFFS' MEMO OF P'S AND A'S ISO
CLASS CERTIFICATION

combination of investments." This generally involves generating a written financial plan by inputting the aforementioned data into a software application that recommends a particular asset allocation.[12]

The fourth step ("Carrying out your choices"), is to "implement the investment strategy you have chosen." This involves recommending stocks or mutual funds that meet the allocation and, if the client agrees, executing the trades.[13]

The fifth step ("Staying committed to you"), is to provide "timely account information," answer questions and stay in "regular contact."

In performing their job duties FAs are required to follow a 500-plus page compliance manual dedicated to their position alone. The Manual states, for example, that the "guidelines set forth on these pages apply to all communications with the public . . . They are strict and should be adhered to at all times." The Manual states that "To ensure message and image consistency, all communications activities with the public must have prior approval from the Branch Manager, Compliance Department, Branch Marketing and/or Corporate Communications." "In regard to communications, the term 'public' should be considered to include clients [and] prospective clients."[14]

Among other restrictions, Morgan requires that any "Research opinions are limited to the contents of published [Morgan Stanley] Research Department reports."[15] Likewise, "Financial Advisors may not author their own opinions or comments concerning the market or economy."[16] Aside from "pre-approved [Morgan Stanley] form letters" all "written communications with clients . . . must

---

[12] Benner Dep., Exh. AA, at 173:20-174:2.
[13] Benner Dep., Exh. AA, at 178-180
[14] Excerpts of Morgan Stanley Compliance Guide, Exh., P at DEF 1557.
[15] Id. at DEF01566.
[16] Id. at DEF01569.

Van Vleck
Turner & Zaller, LLP

1   receive prior approval from the Branch Manager and the Regional Director."[17]  And

2   the Manual continues in the same vein for several hundred additional pages.

3

4   **B.     MORGAN'S CLASSWIDE EXPENSE POLICIES.**

5         During the Class Period Morgan has utilized a uniform set of written policies

6   and agreements for compensating and reimbursing FA expenses.

7         All FAs throughout the Class Period have been subjected to an "Expense

8   Allowance" policy, which set reimbursement caps based on their prior year's

9   production.[18]  Prior to the current litigation, FAs with less than $250,000 in

10  production were given no expense allowance whatsoever under this policy.[19]

11        In addition to requiring FAs to personally pay for any business costs outside of

12  their allowance (if any), Morgan also deducts various debts and expenses directly

13  from FA paychecks.  FAs must sign a standardized "Financial Advisor Employment

14  Agreement," specifically agreeing that they will be liable for any "commission

15  deficits, other employee losses, or customer losses, that are caused or permitted by

16  you," and that "you authorize Morgan Stanley, with or without notice to you, to

17  withhold amounts equal to any such losses."[20]

18

19  **C.     MORGAN'S CLASSWIDE PAY POLICIES.**

20        FAs throughout the nation are compensated according to a document issued at

21  the start of the year entitled "Financial Advisor Compensation and Recognition

22  Programs."[21]  Prior to 2008, FAs received no salary but did receive advances on

23  future commissions known as "refundable draws."  Draws in excess of earned

---

[17] Id at DEF 1576.
[18] Exhs "A" – "H."
[19] In 2010, Morgan renamed the "Expense Allowance" as a "Business Development Allowance" and granted lower producing FAs an annual reimbursement allowance of $250.  (Exh. "H," at DEF 03451.)
[20] See Exhs. "R" and "U," at ¶6.
[21] See Exhs "A"-"E" (2006-2010 FA Compensation and Recognition Policies).

1   monthly commissions were added to a rolling "deficit" that had to be repaid from

2   future wage deductions.  In 2008, Morgan instituted a monthly "salary" equal to

3   twice minimum (and assuming a 40-hour week).  This "salary," however, was

4   somewhat illusory, however, because it was funded by a dollar-for-dollar reduction

5   in any earned commissions up to the full amount of the salary paid.

6

7   **III.   RULE 23 CLASS CERTIFICATION STANDARDS**

8        For purposes of the present motion, "the question is not whether the plaintiff

9   or plaintiffs have stated a cause of action or will prevail on the merits, but rather

10  whether the requirements of Rule 23 are met."[22]  In making this procedural ruling the

11  court "is bound to take the substantive allegations of the complaint as true,"[23] and

12  "must only determine if the plaintiffs have proffered enough evidence to meet the

13  requirements of FRCP 23, not weigh competing evidence."[24]

14       "Courts recognize that employer practices and policies with regard to wages

15  and hours often have an impact on large numbers of workers in ways that are

16  sufficiently similar to make class-based resolution appropriate and efficient."[25]  Class

17  certification is proper notwithstanding that "that individual class members may

18  ultimately need to itemize their damages."[26]   As a result, "wage and hour disputes

19  (and others in the same general class) routinely proceed as class actions."[27]

20

21  **A.      THE CLASS MEETS THE FOUR REQUIREMENTS OF RULE 23(A).**

22       To be certified under Rule 23, "a class action must meet the four requirements of

23  Rule 23(a) and also fall within at least one of three categories set forth in Rule 23(b)." [28]

24

---

[22] *Wang v. Chinese Daily Newspapers, Inc.* 231 F.R.D. 602, 605 (CD Cal. 2005)
[23] *Blackie v. Barrack,* 524 F.2d 891, 901 n. 17 (9th Cir. 1975).
[24] *Wang, supra, at* 605, citing *Staton, et al. v. Boeing Company,* 327 F.3d 938, 954 (9th Cir. 2003).
[25] *Wang v. Chinese Daily Newspapers, Inc.* 231 F.R.D. 602, 614 (CD Cal. 2005).
[26] *Sav-On Drug Stores, Inc. v. Superior Court,* 34 Cal.4th 319, 334-35 (2004).
[27] *Prince v. CLS Transportation, Inc.,* 118 Cal.App.4th 1320, 1328 (2004).
[28] *Wang v. Chinese Daily Newspapers,* 231 F.R.D. 602, 605 (CD Cal. 2005)

The four requirements of Rule 23(a) are: "(1) the class is so numerous that joinder of all members is impractical; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representatives will fairly and adequately represent the interests of the class."[29]  Plaintiffs' claims meet each of these four elements.

Numerosity.  Joinder is clearly impractical as Morgan employed "approximately 2000" FAs during the limitations period.[30]  Thus, Rule 23(a)(1) is satisfied.

Commonality.   "The commonality test is qualitative rather than quantitative-*one significant issue common to the class may be sufficient to warrant certification*."  Determining whether Morgan's "company-wide corporate practices and policies" violate California law is sufficient to satisfy Rule 23(a)(2).[31]

Typicality.  For this factor, it is sufficient that "the class representatives and members of the class share a common issue of law or fact, and are sufficiently parallel to insure a vigorous and full presentation of all claims for relief."[32]  Here, Plaintiffs were subject to the identical policies as the other California FAs they seek to represent.  This meets Rule 23(a)(3)'s requirement of reasonable typicality.

Adequacy.  This factor is met by showing: "(1) that the proposed representative Plaintiffs do not have conflicts of interest with the proposed class, and (2) that Plaintiffs are represented by qualified and competent counsel."[33]  Here, Plaintiffs and the class have no conflicts and Class Counsel is experienced and competent in class action litigation.[34]

---

[29] *Eisen v. Carlisle,* 417 U.S. 156, 177 (1974).
[30] Defendants Answer to Drake Interrogatory No. 1-2, Exh. "Y."
[31] *Dukes v. Wal-Mart,* 503 F.3d 1168, 1177 (9th Cir. 2007).
[32] *Wang, supra*, 231 F.R.D. at 608 (internal citations omitted), quoting *California Rural Legal Assistance Legal Assistance v. Legal Services Corp.*, 917 F.2d 1171, 1175 (9th Cir. 1990).
[33] *Dukes, supra,*, 503 F.3d at 1185, citing *Hanlon,* 150 F.3d at 1020; *Molski,* 318 F.3d at 955.
[34] Declaration of Brian Van Vleck ("Van Vleck Decl.") at ¶¶ 21-31.

**B.      THE CLASS MEETS THE REQUIREMENTS OF RULE 23(B).**

Class certification under Rule 23(b)(2) is appropriate where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."   Plaintiffs in this case are seeking injunctive and declaratory relief for wage and hour violations which will provide long-term benefits to the current and future class members.  Thus, Plaintiffs claims may be certified under either Rule 23(b)(2) or 23(b)(3).

Rule 23(b)(3) requires that common issues "predominate" and that class adjudication is procedurally "superior" to any practical alternative for enforcing the rights at issue.  These criteria are satisfied "whenever the actual interests of the parties can be served best by settling their differences in a single action." [35]

Here, common issues predominate because it is Morgan's *general* policies and practices which are being challenged as illegal under California law.  Adjudicating the legality of Morgan's policies in a single action is vastly more effective and efficient than conducting thousands of individual litigations on the same question.  Thus, class litigation is not only the far "superior" method of enforcing wage rights, it is frequently the only realistic way of doing so.   Certification is therefore proper under Rule 23(b)(3).

**IV.  THE EXPENSE REIMBURSEMENT CLASS SHOULD BE CERTIFIED**

**A. THE CALIFORNIA LABOR CODE PROHIBITS EMPLOYERS FROM SHIFTING BUSINESS COSTS TO THEIR EMPLOYEES.**

Under the California Labor Code, an employee's "wages" include all "benefits to which he is entitled as a part of his compensation," including expense

---

[35] *Hanlon, supra,* 150 F.3d at 1022.

reimbursement.[36]  Thus, unreimbursed business expenses are a form of "unpaid wages,"[37] and the failure to reimburse employee expenses is a form of withholding lawfully earned wages.[38]

California Labor Code section 2802 requires that each California employer "shall indemnify his or her employee[s] for all necessary expenditures or losses incurred by the employee[s] in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer, even though unlawful, unless the employee, at the time of obeying the directions, believed them to be unlawful."  Indemnification rights extend to all costs and losses incurred in the normal "course and scope" of one's employment.[39]

Labor Code sections 221[40] and 223[41] likewise prohibit employer deductions from wages or scheduled pay rates.  Section 8 of Wage Orders 4-2001 also provides

[36] *UI Video Stores, Inc., supra,* at 1091, citing Labor Code section 200.

[37] *UI Video Stores, Inc., supra,* at 1091-1092 (action to recover cost of uniforms that employees were required to purchase out of pocket, was action for "unpaid wages"); *Stuart v. RadioShack Corporation,* 641 F.Supp.2d 901 (N.D. Cal. 2009) ("Reimbursement for expenses is comparable to a wage. In both situations, an employee is owed compensation for services or acts performed for the employer's benefit. In both situations, the compensation is, under governing statutes, owed as a matter of right once incurred or accrued.").

[38]    *Department of Industrial Relations, Division Of Labor Standards Enforcement v. UI Video Stores, Inc.,* 55 Cal.App4th 1084, 1091-92 (1997); *accord Prachasaisoradej v. Ralphs Grocery Co., Inc.,* 42 Cal. 4th 217, 164 Cal.Rptr.3d 407, 413 (2007) ("The employer takes a "deduction" or "contribution" from an employee's "wages" or "earnings" when it subtracts, withholds, sets off, or requires the employee to return, a portion of the compensation offered, promised, or paid as offered or promised, so that the employee, having performed the labor, actually receives or retains less than the *paid, offered, or promised compensation,* and effectively makes a forced "contribution" of the difference.")

[39]    *Edwards v. Arthur Andersen LLP*, 44 Cal.4th 937, 952 (2008) (Section 2802 evinces a "strong public policy ... favor[ing] the indemnification (and defense) of employees by their employers for claims and liabilities resulting from the employees' acts within the course and scope of their employment."); *See also* Rest. 3d Agency at § 8.14, Duty to Indemnify ("A principal has a duty to indemnify an agent . . . (a) when the agent makes a payment (i) within the scope of the agent's actual authority, or (ii) that is beneficial to the principal . . ."

[40]    "It shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee."  (Labor Code section 221).

[41]    "Where any statute or contract requires an employer to maintain the designated wage scale, it shall be unlawful to secretly pay a lower wage while purporting to pay the wage designated by statute or by contract."  (Labor Code section 223.)

that "No employer shall make any deduction from the wage or require any reimbursement from an employee for any cash shortage, breakage, or loss of equipment, unless . . . caused by a dishonest or willful act, or by the gross negligence of the employee."  California law also prohibits Morgan from using its access to employee payroll to take "self-help" debt collection payments from earned wages.[42]

For example, in rejecting the claims of an insurance brokerage which had requested its managers to fund their own assistant's salaries, the California Division of Labor Standards Enforcement explained:

> [Labor Code sections 2802 and 2804] announce the long-standing
> policy of the state of California in regard to an employer's obligation
> to pay all costs his employee expends or loses in carrying out the
> duties of the employment.  The employment of more help to either
> sell insurance or help with the paperwork so that others would be free
> to sell more insurance is . . . a "direct consequence of the discharge of
> [the Manager's] duties."
>
> As is clear from the legislation, under the California law, an employer
> may not "pass through" the normal costs of operating a business to the
> employee he hires.  ***Debiting an employee's earned wages to cover a***
> ***normal operating expense of the employer is not allowed in***
> ***California.***[43]

In short, California authorities have synthesized the various employee protections into a general rule prohibiting any compensation scheme whereby employees are required to act, directly or indirectly, as "insurers of the employer's business losses."[44]

---

[42] *Barnhill v. Robert Saunders & Co.*, 57 Cal.2d 319 (1962) ("self-help" wage setoff violates California debtor-protection laws including procedures for wage garnishment and employee bonds.); Labor Code section 400 *et seq.*

[43] August 1, 2000 DLSE Opinion Letter, Exh. "I," at p. 4 (emphasis added).

[44] *Kerr's Catering Service v. Department of Industrial Relations*, 57 Cal.2d 319, 327 (1962).

## B. MORGAN IS LIABLE IF IT HAS ACTUAL OR CONSTRUCTIVE KNOWLEDGE OF UNREIMBURSED EXPENSES.

Expense reimbursement is a component of earned wages which is non-negotiable to the same degree as minimum wage or overtime payments.[45]

For example, in the recent case of *Stuart v. Radio Shack,* the Northern District certified a class of employees seeking mileage reimbursement.  The Court also held that the duty to reimburse employee expenses is analogous to the duty to pay non-exempt employees for all hours worked.   Thus, an employer is liable so long as it merely "suffers or permits" an employee to incur work-related expenses.[46]

One consequence is that Morgan cannot require employees to exhaust all real or imagined internal remedies for seeking reimbursement as a pre-condition for securing their statutory rights.  In fact, the *Stuart* Court

> RadioShack's contention is that the duty to reimburse is triggered *only* when an employee makes a request for reimbursement even if the employer knew or had reason to know the expense was incurred. . . . [S]uch a narrow construction is at war with § 2802's "strong public policy favoring the indemnification (and defense) of employees by their employers for claims and liabilities resulting from the employees' acts within the course and scope of their employment.
>
> The Court concludes that a fair interpretation of §§2802 and 2804 which produces "practical and workable results," [*Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal.4th 554, 567 (2007)], consistent with the public policy underlying those sections, focuses *not on whether an employee makes a request for reimbursement but rather on whether the employer either knows or has reason to know that the employee has incurred a reimbursable expense.* If it does, it must exercise due diligence to ensure that each employee is reimbursed.[47]

In this case, Morgan's own policies amply demonstrate that it "knew or had

---

[45] *Arriaga v. Florida Pacific Farms, LLC,* 305 F.3d 1228, 1236 (11th Cir. 2002); *UI Video, supra.*
[46] *Stuart v. RadioShack Corporation,* 641 F.Supp.2d 90, 903 (N.D. Cal. 2009).
[47] *Stuart, supra,* 641 F.Supp 2d. at 903 (internal citations omitted) (emphasis added).

reason to know" that its FA Expense Allowance Policy (which commonly assigned an Expense Allowance of zero) was resulting in a systematic under-reimbursement of business expenses.

### C. MORGAN WRITTEN POLICIES REQUIRE THE CLASS TO FUND ITS OPERATING COSTS.

Each year Morgan propounds a uniform "Expense Allowance" Policy for FAs, which is uniform throughout the United States.  From 2006 to 2009, any FA with a "Previous Year's Gross Production" of less than $250,000 was assigned a yearly expense allowance of zero – i.e., they were ineligible for reimbursement.[48]

An FA with $500,000 production per year receives an expense allowance of just $2,000 per year, or about $167 per month.   Morgan is well aware that its FAs are incurring costs in performing their jobs which far exceed these paltry expense allowances.  This is confirmed by Morgan's practice of deducting from FA compensation to pay for the same business expenses that it refuses to reimburse.

Under Morgan's "Additional Facilities & Services Policy,"[49] for example, it agrees to pay for certain ordinary business expenses, such as assistant compensation, postage, and the cost of client seminars.  In return, however, FAs are required to sign a contract authorizing Morgan to deduct these amounts from future paychecks.

The point of this program is that the paycheck deductions are made on a <u>pre-tax</u> basis thus partly mitigating the cost to the employee (at no expense to the employer).  Indeed, the Policy itself recites that these expense items are "bona fide business costs that relate to Morgan Stanley's business and which would qualify as deductible business expenses under applicable provisions of the Internal Revenue

---

[48] See e.g., 2009 Compensation and Recognition Programs, Exh. D, Section 2.4, "Expense Allowance," at p. 31.

[49] Additional Facilities and Services Policy, Exh. X, at p. 1.

Case No. CV 09-6467
PLAINTIFFS' MEMO OF P'S AND A'S ISO
CLASS CERTIFICATION

1  Code and Treasury Department Regulations."[50]

2      To be a tax deductible business expense, however, an item must be "an

3  ordinary and necessary business expense."[51]  An expenditure meeting this IRS

4  standard is also, by definition, incurred in the "course and scope" of employment,

5  thereby triggering mandatory reimbursement rights under Labor Code 2802(a).[52]

6  Indeed, having represented to the IRS that these deductions are "ordinary and

7  necessary" business expenses, Morgan is estopped from arguing that these expense

8  items are now merely un-reimbursable "luxuries."[53]

9      Aside from a potential tax benefit, the "Additional Services" program is no

10  better for FAs than the usual arrangement of paying expenses out of pocket with no

11  reimbursement.   Nevertheless, the "Additional Services" program establishes a

12  number of important class-wide facts: e.g., (a) that Morgan was aware that FAs were

13  incurring the listed business costs;[54] (b) These costs are an "ordinary and necessary"

14  part of employment as an FA; and (c) Morgan has encouraged and facilitated the FAs

15  _____

16  [50]   Id.
    [51]   26 U.S.C. Section 162(a).
17  [52]   See e.g., *Silberman v. U.S.,* 40 Fed. Cl. 895, 901 (1998) ("Numerous courts have held that
18  an expense is not 'necessary' under § 162(a) when an employee fails to claim reimbursement for
    the expenses, incurred in the course of his employment, when entitled to do so.")
19  [53]   See e.g., *Rissetto v. Plumbers and Steamfitters Local 434,* 94 F.3d 597, 600 (9th Cir. 1996)
    [54] See Exh "X:" The listed items subject to payroll deduction rather than reimbursement are:
20       (1) "salary or hourly compensation" for a Sales Assistant "to engage additional
          support above and beyond what is already provided by the Firm;"
21       (2) "Any state registration in addition to the registration required in the state where
          the FA is employed;"
22       (3) "Workstation services to benefit the employee;"
23       (4) "Seminars not required by the Firm which are given by the Employee to current or
          prospective clients;"
24       (5) "Postage incurred for mailings to clients;"
25       (6) "Blackberry Handheld Costs;"
         (7) "Local Advertising;"
26       (8) "Additional Office Space;"
         (9) "Waiver of Client Fees;"
27       (10) "Additional Continuing Education;" and
         (11) "Remote Computing Costs."

28

VAN VLECK
TURNER & ZALLER, LLP

1  in incurring the very business costs that it also refuses to reimburse (but which

2  obviously redound to its benefit by increasing revenues).

3  　　　Morgan will presumably dispute these conclusions.  It is beyond dispute,

4  however, that the legal consequences of these class-wide policies are a matter which

5  should be decided on a class-wide basis.

6

7  **V.  THE OVERTIME CLASS SHOULD BE CERTIFIED**

8  　　　**A.  THE CLASS IS PRESUMPTIVELY ENTITLED TO PREMIUM**

9  　　　　**OVERTIME COMPENSATION.**

10  　　　"The California Labor Code provides that employees are presumptively

11  entitled to be paid overtime for all hours worked in excess of eight hours during a

12  day or forty hours a week, and are entitled to recover unpaid amounts at a rate of at

13  least 1.5 times the employee's regular rate of pay."[55]  These laws "serve the

14  important public policy goal of protecting employees in a relatively weak bargaining

15  position against the evil of overwork."[56]  They also "spread employment throughout

16  the work force by putting financial pressure on the employer."[57]

17  　　　The Labor Code does authorize the Labor Commissioner to establish certain

18  limited exemptions to the overtime statute, which are contained in the relevant Wage

19  Orders governing particular industries and employees.[58]   Under California law,

20  however, the scope of these exemptions are "narrowly construed" and constitute

21  affirmative defenses which "the employer bears the burden of proving."[59]  In light of

22  these principles, overtime cases "routinely proceed as class actions."[60]

23  _____

[55]   *Alba v. Papa John's,* 2007 WL 953849 at *4 (C.D.Cal. 2007), 12 Wage & Hour Cas.2d
24  (BNA) 710, citing Cal. Lab. Code section 510(a).
[56]   *Gentry v. Superior Court,* 42 Cal.4th 443, 456 (2007), quoting *Barrentine v. Arkansas-Best*
25  *Freight System,* 450 U.S. 728, 739 (1981).
[57]   *Gentry, supra,* 42 Cal.4th at 456.
[58]   Cal. Lab. Code section 515(a)-(b).
26  [59]   *Ramirez v. Yosemite Water Co., Inc.,* 20 Cal.4th 785, 794-95 (1999)(internal citations and
27  punctuation omitted)(emphasis added).
[60]   *Prince, supra,* 118 Cal.App.4th at 1328;  *Hill v. Eddie Bauer,* 242 F.R.D. 556, 562 (C.D.

28

The same conclusion applies in this case.  Morgan's overtime policy provides that "[a]n employee's classification (i.e., "exempt" or "non-exempt") is based on job function in accordance with the Fair Labor Standards Act and applicable state wage and hour laws."[61]  And throughout the class period all FAs were denied overtime based on their job title alone, and without regard to any alleged variation in their job duties or compensation.  As the California Supreme Court has explained class certification is proper in order to determine whether Morgan's "classification based on job descriptions alone [has] resulted in widespread de facto misclassification."[62]

As explained below, a finding of "widespread de facto misclassification" can be based on any number of class wide issues pertaining to the fundamental nature of the FA position and the compensation paid by Morgan.  This action is therefore appropriate for class status under Rule 23.

## B. THE "PROFESSIONAL" AND "ADMINISTRATIVE" EXEMPTIONS INVOLVE COMMON ISSUES.

### 1. Does Morgan's Pay Scheme Meet The "Salary Basis Test?"

To claim the administrative or professional exemption Morgan must prove that FAs "earn a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment."[63]  Based on the current state minimum wage of $8.00, a bona fide monthly salary of at least $2,774 is required.  This is an objective criterion which may be established or negated on a class wide basis.

---

Cal. 2007) ("wage and hour disputes (and others in the same general class) routinely proceed as class actions.").

[61] See Morgan Policy re "Employee Classification and Overtime," Exh. DD [DEF02780].

[62] *Sav-On Drug Stores, Inc. v. Superior Court,* 34 Cal.4th 319, 329 (2004).

[63] Wage Order 4-2001 at Section (1)(A)(2)(g).

### a.   Did Morgan's Failure To Pay Salary Prior To 2008 Negate Its Exemption Defense For That Time Period?

Prior to 2008, Morgan provided no guaranteed minimum earnings whatsoever. Rather, if an employee's commissions or other "Incentive Compensation" did not equal twice the minimum wage Morgan would merely <u>loan</u> him the difference as a so-called "refundable draw."  These loans were carried forward as an accumulated "deficit" which had to be repaid from future paycheck deductions.[64]

In *Takacs v. A.G. Edwards & Sons, Inc.*, the District Court found that an identical compensation system for a class of financial advisors failed to meet the "salaried-basis" test.  As the Court explained, "if a guaranteed monthly minimum was required to be repaid in subsequent months, it would *not* be free and clear."[65] Thus, Morgan's requirement that refundable draws be repaid is "an impermissible offset that is taken from Plaintiffs' guaranteed salary."[66]

Under *Takacs,* Morgan's pre-2008 policy of providing minimum draws which were offset by repayable "deficits" cannot satisfy "its initial burden of showing that Plaintiffs' salary basis comes within the administrative exemption of the FLSA [or California Labor Code]."[67]  In any event, deciding whether Morgan's refundable draw payments satisfy the legal salary-basis test is a class-wide issue.

### b.   Do Morgan's Pay Deductions Negate The "Salaried Basis?"

Beginning in 2008, Morgan began paying a "salary" to FAs.  But this nominal amount is still not paid "free and clear" and fails to satisfy the salary-basis test.

First, this so-called salary is offset against monthly commissions.  For example, suppose an FA generates sales entitling him to $5,000 in commissions.  Prior to 2008 he would have received $5,000 in commissions and $0 in salary.  After

---

[64] Financial Advisor Employment Agreement, Exh. at ¶ 6. Cassero Dep., Exh. BB at 94:8-95:4.
[65] *Takacs v. A.G. Edwards & Sons, Inc.,* 444 F.Supp.2d 1100, 1109 (S.D. Cal. 2006).
[66] *Takacs, supra,* 444 F.Supp.2d at 1110.
[67] *Takacs, supra,* 444 F.Supp.2d at 1110.

VAN VLECK
TURNER & ZALLER, LLP

1  2008 his new $2,774 "salary" is merely deducted from his commission amount so

2  that he is still paid just $5,000 – the identical compensation amount is now merely

3  re-labeled as $2,774 in "salary" and $2,226 in commissions.

4          Secondly, the amount labeled as "salary" is not paid "free and clear" because it

5  is further reduced by the substantial chunks of Morgan's operating costs for which

6  FAs are financially responsible.  As a matter of law, "there is no legal difference

7  between deducting a cost directly from the worker's wages and shifting a cost, which

8  they could not deduct, for the employee to bear." [68]   The requirement to pay a

9  minimum compensation threshold thus "cannot be avoided by simply requiring

10 employees to make such purchases on their own."[69]

11         For example, suppose an FA earns only the minimum monthly "salary" of

12 exactly twice minimum wage – or $2,774.  If the FA has (conservatively) incurred

13 $800 in business costs his *net* salary during the month is just $1,974, well below the

14 minimum threshold necessary to maintain the exemption.  Indeed, unreimbursed

15 expenses for travel, telecommunications, marketing, assistant compensation, and the

16 like might easily exceed his entire salary for the month.  During such a month the FA

17 will have actually lost money performing his job.  An employee who can even

18 theoretically lose money performing his job is plainly not receiving any "guaranteed"

19 net compensation.

20         Indeed, it is well settled that if an "employer has an actual practice of making

21 improper deductions, the exemption is lost during the time period in which the

22 improper deductions were made for employees in the same job classification." [70]

23

24

25 [68] *Arriaga, supra*, at 1236; accord *Kerr's Catering Service v. Department of Industrial Relations*,

26 57 Cal.2d 319, 327 (1962) (employees cannot be required to act, directly or indirectly, as "insurers
   of the employer's business losses.").

27 [69] *Id.*

   [70] 29 CFR § 541.603.

28

Whether Morgan's dubious "salary" payments meet the salary basis test is thus a common class wide issue which should be decided on a class wide basis.

### 2.    Is The FA Position Part Of A "Learned Profession?"

As an affirmative defense to its obligation to pay overtime, Morgan has alleged that the duties of the FA position meet the "professional" exemption test. The professional exemption applies to those "primarily engaged" in "Work requiring knowledge of an advanced type in a field or science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education."[71] [72]

"If a job does not require knowledge customarily acquired by an advanced educational degree-as for example when many employees in the position have no more than a high school diploma-then, regardless of the duties performed, the employee is not an exempt professional."[73]

For example, in the recent Second Circuit case of *Young v. Cooper Cameron,* the plaintiff was a mechanical engineer working as a "Product Design Specialist." He designed "large and complex" oil drilling equipment and his work "required depth of knowledge and experience, and entailed considerable responsibility and discretion."[74] Nevertheless, the position could not qualify for the professional exemption because the work "require[d] no formal advanced education."[75]

---

[71] Wage Order 4-2001, Section 1(A)(3)(b)(i).

[72] The Wage Order also specifically exempts the professions of "law, medicine, dentistry, optometry, architecture, engineering, teaching, or accounting," (Section 1(A)(3)(a)), as well as professional employees "in a recognized field of artistic endeavor" (Section 1(A)(3)(b)(ii)). Neither of these subdivisions is relevant here, however.

[73] *Young v. Cooper Cameron Corporation,* 586 F.3d 201,206 (2d Cir. 2009).

[74] *Id.* at 203-204.

[75] Id. at 205.

1    Here, The FA position likewise requires no college degree, much less
2  advanced or specialized post-graduate study.  While Morgan generally expects its
3  trainees to have some sort of college degree, this is not required for laterals or new
4  applicants with relevant sales experience.[76]  Instead, the basis for Morgan's
5  professional exemption defense is that FAs "must pass a qualification examination,
6  the most common of which is the 'Series 7.'"[77]  The Series 7 exam is a six-hour test
7  consisting of 250 multiple-choice questions.  No educational prerequisite or formal
8  coursework are required to sit for the exam.[78]

9    It is premature to decide whether these registration requirements elevate the
10  FA position to a "learned profession."  But this is undoubtedly a dispositive common
11  question which applies to all FAs equally.

12    **3.    Does The FA Position Meet The Administrative Duties Test?**

13    In addition to the "salary basis" and minimum compensation elements
14  described above, a position cannot qualify for the administrative exemption unless it
15  primarily involves *bona fide* administrative duties.  The Financial Advisor ("FA")
16  position is likely to fail this "duties test" on a number of independent grounds.

17    **a.    Are FAs Involved Principally In Selling?**

18    In addition to the Administrative exemption, Morgan is alleging that the FA
19  position qualifies for the "Commissioned Sales" exemption.[79]  A necessary element
20  of that exemption, however, is that "the employees must be involved principally in
21  selling a product or service."  In other words, Morgan is simultaneously contending
22  that FAs are salesmen and administrators.  But selling is not administration and a
23  sales position cannot meet the administrative exemption.[80]   Morgan's
24  "commissioned sales" defense thus negates the administrative exemption.

25
26  [76] Position Summary, Exh., N; Benner Decl., Exh. AA, at 213:6-18.
     [77] Response to Plaintiff Adam Scott Interrogatory No. 8, Exh. Z, at p. 5:3-17.
     [78] Drake Decl. at ¶ 7.
27  [79] See Answer at Affirmative Defense No. 10.
     [80] *Davis v. J.P. Morgan Chase & Co.,* 587 F.3d 529, 531 (2d Cir. 2009).
28

**b.**  **Are The Duties of The FA Position "Directly Related To Management Policies and General Business Operations?"**

The Administrative Exemption may apply only where a position primarily requires the performance of duties which are "directly related to management policies or general business operations."[81]  Regulations incorporated by Wage Order 4-2001[82] state that such administrative work must consist of "those types of activities relating to the administrative operations of a business as distinguished from 'production' or, in a retail or service establishment, 'sales' work."[83]

The first step in the exemption analysis is therefore to decide whether the position's primary duties should "*be classified as belonging in the administrative category, which falls squarely within the administrative exception, or as production/sales work, which does not*."[84]  This so-called "dichotomy" test is a threshold requirement under both California and federal law.[85]  The "essence" of the dichotomy is that an administrative position involves the internal "running of a business, and not merely ... the day-to-day carrying out of its affairs."[86]

A position is deemed to fall squarely on the "production" side where its "*primary duty is producing the commodity or commodities, whether goods or services, that the enterprise exists to produce*."[87]  For example, in *Bell v. Farmers Insurance Exchange ("Bell II")*,[88] the California Court of Appeal applied the

---

[81] Wage Order 4-2001 at Section (1)(A)(2); 29 CFR 541.201(a); *See* also Labor Code §515(a).
[82] See 29 C.F.R. section 541.205(a); Wage Order 4-2001 at Section (1)(A)(2)(f) ("The activities constituting exempt work and non-exempt work shall be construed in the same manner as such terms are construed in the following regulations under the Fair Labor Standards Act effective as of the date of this order: 29 C.F.R. Sections 541.201-205, 541.207-208, and 541.210, 541.215.")
[83] *Davis v. J.P. Morgan Chase & Co.,* 587 F.3d 529, 531 (2d Cir. 2009); 29 C.F.R. § 541.2(a).
[84] *Davis*, supra, 587 F.3d at 531-32.
[85] *Bell v. Farmers Insurance Exchange*, 87 Cal. App. 4th 805, 829 (2001) ("Bell II"); *Bratt v. County of Los Angeles*, 912 F.2d 1066, 1070 (9th Cir. 1990) (internal quotations omitted).
[86] *Bratt v. County of Los Angeles*, 912 F.2d 1066, 1070 (9th Cir. 1990).
[87] *Bell II*, supra, 87 Cal.App.4th at p. 820 (emphasis added), citing *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1230 (5th Cir. 1990); 29 C.F.R. §§ 541.2, 541.205(a).
[88] *Bell v. Farmers Insurance Exchange*, 87 Cal. App. 4th 805, 829 (2001) ("Bell II").

dichotomy test to reject the administrative exemption as to an entire class of insurance adjusters.[89]  As a result, it granted summary adjudication for the class.[90]

In sum, an exempt administrative position: (1) <u>must</u> primarily involve "running the business itself or determining its overall course or policies;"[91] (2) <u>must</u> perform these functions at the level of "policy-making" rather than policy implementation; and (3) <u>cannot be</u> directly involve the provision of the very services the employer sells to customers.  If the FA position is properly characterized as "production" work by these criteria the administrative exemption cannot apply.[92]

Because the "administrative/production dichotomy" test turns on a <u>qualitative</u> assessment of the FA position's overall "role in the business enterprise," it is tailor-made for class-wide resolution.[93]

## C.   THE "COMMISSIONED SALES" EXEMPTION INVOLVES COMMON ISSUES.

As its final affirmative defense Morgan has pleaded the Commissioned Sales exemption.[94]  This defense requires Morgan to affirmatively prove that FAs: (a) are "involved principally in selling a product or service, not making the product or rendering the service;"[95] (b) receive 150% of minimum wage in guaranteed weekly earnings; and (c) receive 50% or more of their total compensation in the form of commissions.  Morgan must prove all three elements to avoid paying overtime.

---

[89] *Bell II*, *supra*, at 824.
[90] *Bell II*, *supra*, at 826.
[91] *Bratt, supra*, at 1070.
[92] *Davis, supra*, 587 F.3d at 532-33; Id. at n. 3-4.
[93] *See Bell*, 87 Cal. App. 4th at 819-820; 826-27
[94] Wage Order 4-2001 Section 3(D).
[95] *Takacs v. A.G. Edwards and Sons, Inc.,* 444 FSupp2d 1100, 1119-1120 (SD Cal. 2006).

### a.   Is Morgan Precluded From Claiming The FA Position Is Primarily Engaged In "Commissioned Sales"?

In *Ramirez v. Yosemite Water Co.,* the California Supreme Court explained that the Commissioned Sales exemption may apply only to employees who are "involved principally in selling a product or service, ***not making the product or rendering the service*.**[96]   For example, in *Keyes Motors v. DLSE,* the Court rejected the Commissioned Sales exemption as to mechanics paid as "a percentage of the hourly rate charged the customer per repair."[97]

> It may be true that parts and labor are ultimately sold because mechanics diagnose the need for additional repairs. However, this diagnosis and recommendation is no more "salesmanship" than a plumber's diagnosis and recommendation that an additional pipe is needed to make a repair. Put simply, a mechanic performs labor, not sales.[98]

Under *Ramirez* and *Keyes,* the performance of client services by FAs and the marketing and sales of their own services are both non-exempt.  Like the mechanics at issue in *Keyes,* FAs may occasionally "diagnose the need" for certain financial transactions.  But it is ultimately the FA himself who executes the trades and performs the client service work.  Thus, under *Ramirez* and *Keyes* the nature of the FA position precludes Morgan from invoking the Commissioned Sales exemption. This is a common issue for the entire class.

### b.   Does Morgan Owe Unpaid Overtime For Weeks When FAs Earned Less than 150% of Minimum Wage?

To be exempt from overtime a Commissioned Sales employee must also earn "one and one-half (1 1/2) times the minimum wage,"[99] or about $480 per week.[100]

---

[96] *Ramirez, supra,* at 803-804, quoting *Keyes Motors, Inc. v. Div. of Lab. Std. Enforcement,* 197 Cal.App.3d 557, 563 (1987); accord *Takacs, supra,* at 1119-20.
[97] *Keyes Motors, Inc. v. Div. of Lab. Std. Enforcement,* 197 Cal.App.3d 557, 563 (1987).
[98] *Keyes Motors, supra,* at 563-64.
[99] Wage Order 4-2001, Section 3(D); FLSA, Section 7(i).

1   This minimum compensation threshold may be satisfied by payment of either a <u>non-</u>
2   <u>refundable</u> "guaranteed" draw or salary for each workweek.  Morgan Stanley,
3   however, has never guaranteed this minimum threshold.

4     Prior to 2008 Morgan Stanley merely advanced a repayable draw (i.e. a loan)
5   for each pay period.  After 2008, Morgan Stanley provided a nominal weekly salary
6   of approximately $640.[101]  But this payment was subject to reduction through
7   unreimbursed business expenses and was thus not aid "free and clear."  As a result of
8   these expense deductions, the earnings of FAs were regularly depressed well below
9   the minimum earning threshold necessary to claim the exemption.  Yet, Morgan
10   continued to treat the entire class as exempt due to job title alone.

11

12      **c.**  **Does Morgan Owe Unpaid Overtime For Periods When FA**
13         **Commissions Are Below 50% of Total Compensation?**

14     Even in those weeks when the 150% of minimum wage threshold is met, the
15   exemption is forfeit unless "more than half of that employee's compensation
16   represents commissions."[102]  Even assuming that all Incentive Compensation is
17   "commissions," Morgan's own payroll records conclusively demonstrate that it
18   systematically fails to pay overtime during months when FAs cannot possibly be
19   exempt – i.e., because they fail to meet the objective 50% commission threshold.
20   This occurred frequently for named Plaintiffs.

21     It is thus a common question whether Morgan systematically refused to pay
22   overtime even when its own records established the exemption could not apply.

23

24

25

26

27

28

---

[100] Current California minimum wage is $ 8.00 [(40 hrs) x (8.00/hr.) x (1.5) = $480/week].
[101] [($2,774/mo.) x (12mo.)] ÷ 52 weeks = $640/week.
[102] Wage Order 4-2001, Section 3(D).

Case No. CV 09-6467
PLAINTIFFS' MEMO OF P'S AND A'S ISO
CLASS CERTIFICATION

# VI.  THE "RESTRAINT OF TRADE" CLASS SHOULD BE CERTIFIED

Business and Professions Code Sections 16600 provides that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."   Section 16600 reflects a determination that "the interests of the employee in his own mobility and betterment are deemed paramount to the competitive business interests of employers."[103]   And it thus creates "an absolute bar to post- employment restraints."[104]

A provision need not impose an outright ban on competition to run afoul of Section 16600.  Rather, any contract provision "imposing a penalty" for employee competition may be deemed invalid. [105] For example, in the leading California Supreme Court decision of *Chamberline v. Augustine,*[106] the Court struck down a $5,000 liquidated damages provision triggered when an employee accepted competing employment.  In *Muggill v. Reuben H. Donnelly Corp.*,[107] the Court extended the same reasoning to strike a retirement plan provision that denied certain benefits if a recipient became employed with a competitor.

Here, Morgan has imposed similar anti-competitive penalties which may be deemed facially invalid under Section 16600.  In particular, Morgan required all FAs to execute a standardized Financial Advisor Employment Agreement which provides *inter alia* that, any customer who is "serviced" at any time by the FA during his employment belongs to Morgan and may not be contacted "directly or indirectly" for one year after the FA is terminated or resigns.[108]

This practice, by itself, violates the letter and spirit of the Labor Code's prohibition against compelling an employee "to patronize his or her employer . . . in

---

[103] *Application Group, Inc. v. Hunter Group, Inc.,* 61 Cal.App.4th 881, 900 (1998).
[104] *KGB, Inc. v. Giannoulas,* 104 Cal.App.3d 844, 848 (1980).
[105] *Muggill v. The Reuben H. Donnelley Corp.,* 62 Cal.2d 239, 242 (1965).
[106] *Chamberline v. Augustine,* 172 Cal. 285, 288 (1916).
[107] *Muggill v. The Reuben H. Donnelley Corp.,* 62 Cal.2d 239 (1965).
[108] Financial Advisor Employment Agreement, Exhs. R and U, at ¶¶3.1-3.2.

the purchase of any thing of value."[109]  But Morgan also requires FAs to execute a Promissory Note Acknowledgement Form agreeing that the entire loan balance is accelerated and due immediately upon resignation.[110]

The effect of these provisions is to erect a substantial barrier for any FA who wishes to leave Morgan's employment.  Such an individual is faced with the unappetizing prospect of immediately paying tens of thousands of dollars while being restrained from earning a living by contacting any of his own clients.  Even clients originated solely by the departing FA or brought over from prior employment are deemed to be off-limits "customers of Morgan Stanley."

"Controversies involving widely used contracts of adhesion present ideal cases for class adjudication."[111]  As a result, the FAs are entitled to seek class-wide declaratory relief to determine whether these provisions constitute void and illegal restraints on competition.

Dated:  February 15, 2010        VAN VLECK TURNER & ZALLER, LLP
                                 Brian Van Vleck
                                 Anthony J. Zaller


                                 By:  _____/s/_____
                                             Brian F. Van Vleck
                                 Attorneys for Named Plaintiffs
                                 Jeremy J. Drake and Adam Scott

---

[109] Labor Code § 450.
[110] Promissory Note Acknowledgement Form, Exhs., "T" and "W."
[111] *Keating v. Southland Corp.*, 31 Cal.3d 584, 609 (1982).