VAN VLECK TURNER & ZALLER LLP
   Brian F. Van Vleck, State Bar No. 155250
   bvanvleck@vtzlaw.com
   Anthony J. Zaller, State Bar No. 224844
   azaller@vtzlaw.com
555 West Fifth Street
31st Floor
Los Angeles, California 90013
Telephone:  (213) 996-8445
Facsimile:  (213) 996-8378

Attorneys for Named Plaintiffs
JEREMY J. DRAKE and ADAM SCOTT

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMY J. DRAKE AND ADAM SCOTT, on behalf of themselves and others similarly situated,<br><br>        Plaintiffs,<br><br>   vs.<br><br>MORGAN STANLEY & COMPANY, INC., MORGAN STANLEY DW, INC., and DOES 1 through 100 inclusive,<br><br>        Defendants.<br><br>_____<br><br>AND RELATED COUNTERCLAIMS. | CASE NO: CV 09-6467 ODW (RCx)<br><br>**CLASS ACTION**<br><br>**REPLY BRIEF IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>DATE:  April 26, 2010<br>TIME:   1:30 p.m.<br>CTRM:  26<br><br>Action Filed:  July 30, 2009<br>Trial Date:    None Set |

# TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION ....................................................................... 1

II. CLASS CERTIFICATION STANDARDS. .................................. 2

III. WHETHER MS's POLICY UNDER-REIMBURSES EXPENSES .................. 3

    A.    PLAINTIFFS' THEORY IS AMENABLE TO CLASS TREATMENT. .................................................... 3

    B.    MS's DEFENSE RAISES NO PREDOMINANT INDIVIDUAL ISSUES. ....................................... 4

        1.    Isolated Exceptions To An Illegal Policy Do Not Defeat Certification. ...................................... 4

        2.    The Correct Interpretation of Section 2802 Is A Common Issue. ........................................... 5

        3.    Damage Calculations Are No Barrier To Certification. ......................................................... 5

IV. WHETHER FAs WERE PAID ON A "SALARY BASIS." ................ 7

    A.    THE ADEQUACY OF "RECOVERABLE DRAWS" IS A COMMON ISSUE. ................................................ 7

    B.    THE ADEQUACY OF USING COMMISSION DEDUCTIONS TO PAY "SALARY" IS A COMMON ISSUE. ...................................................................... 8

    C.    WHETHER THE SALARY BASIS SURVIVES MS'S WAGE DEDUCTIONS IS A COMMON ISSUE. ............... 9

V. WHETHER THE FA POSITION IS ON THE "PRODUCTION" SIDE OF THE DICHOTOMY TEST IS A COMMON ISSUE. ........ 9

    A.    THE DICHOTOMY TEST CAN BE APPLIED ON A CLASS BASIS. ............................................................. 10

    B.    WHETHER PARTICULAR FA DUTIES ARE "DIRECTLY RELATED" TO THE MANAGEMENT POLICES AND GENERAL BUSINESS OPERATIONS" OF MS ITSELF IS A COMMON ISSUE. .......................... 11

    C.    WHETHER PARTICULAR FA DUTIES ARE "DIRECTLY RELATED" TO THE "MANAGEMENT POLICES AND GENERAL BUSINESS OPERATIONS" OF MS'S CUSTOMERS IS A COMMON ISSUE. ................. 12

    D.    MS RAISES NO GENUINE INDIVIDUALIZED ISSUES BARRING CERTIFICATION. ................................... 14

1. MS's "Marketplace Offerings" Are a Common Question. ................................................................. 14

2. Distinguishing "Sales" From Administrative "Marketing and Promotion" is a Common Issue. ................... 15

3. Identifying Duties "Incidental" to Sales is Common.............. 17

VI. WHETHER THE FAs WORK IN A PROFESSIONAL OCCUPATION IS A COMMON ISSUE......................................... 17

VII. WHETHER THE FA POSITION MEETS ALL REQUIREMENTS OF THE COMMISSIONED SALES EXEMPTION IS A COMMON ISSUE. ......................................................................... 18

VIII. THE RESTRAINT OF TRADE CLAIMS ARE COMMON ........................ 19

Van Vleck
Turner & Zaller, LLP

## TABLE OF AUTHORITIES

PAGE

CASES:

*Armenta v. Osmos,*
     135 Cal.App.4th 314 (2005) ........................................................ 8

*Arriaga v. Florida Pacific Farms, LLC,*
     305 F.3d 1236 (11 th Cir. 2002) ................................................. 8

*Astaire v. Best Film & Video Corp.,*
     116 F.3d 1297 (9th Cir. 1997) ................................................... 8

*Ayer v. SGS Control Svcs, Inc.,*
     2004 WL 2978296 (S.D.N.Y. 2004) ........................................... 9

*Bell v. Farmers Insurance Exchange,*
     87 Cal App. 4th 825 (2001) ................................................ 14, 16

*Bifulco v. The Mortgage Zone, Inc.,*
     262 F.R.D. 209 (E.D.N.Y. 2009) ............................................... 7

*Blackie v. Barrack,*
     524 F.2d 891 (9th Cir. 1975) ..................................................... 2

*Bothell v. Phase Metrics, Inc.,*
     299 F.3d 1120 (9th Cir. 2002) ................................................. 11

*Bratt v. County of Los Angeles,*
     912 F.2d 1066 (9th Cir. 1990) ................................................. 13

*Brooks v. Educators Mut. Life Ins. Co.,*
     206 F.R.D. 96 (E.D. Pa. 2002) ................................................ 19

*Brown v. Cameron-Brown Co.,*
     92 F.R.D. 32 (D.C. Va. 1981) ................................................... 2

*Campbell v. Pricewaterhouse Coopers,*
     253 F.R.D. 586 (E.D. Cal 2008) ..................................... 2, 13, 17

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.,*
     20 Cal.4th 163 (1999) ......................................................... 1, 19

Van Vleck
Turner & Zaller, LLP

Case No. CV 09-6467
PLAINTIFFS' MEMO OF P'S AND A'S ISO
CLASS CERTIFICATION

# TABLE OF AUTHORITIES

**PAGE**

**CASES:**

*Davis v. J.P. Morgan Chase & Co.,*
    587 F.3d 529 (9th Cir. 2009) ........................................................ 11

*Dodge v. County of Orange,*
    226 F.R.D. 177 (SD NY 2005) ..................................................... 4

*Estrada v. FedEx Ground Package System, Inc.,*
    154 Cal.App.4th 1 (2007) ............................................................. 6

*Friedman v. 24 Hour Fitness USA, Inc.,*
    580 F.Supp.2d 985 (C.D. Cal. 2008) .......................................... 19

*Gattuso v. Harte-Hanks Shoppers, Inc.,*
    42 Cal.4th 554 (2007) .............................................................. 6, 7

*Gen. Tel. Co. v Falcon,*
    457 U.S. 147 (1982) ...................................................................... 2

*Hanlon v. Chrysler Corp.,*
    150 F.3d 1011 (9th Cir. 1998) ..................................................... 2

*In re TFT-LCD (Flat Panel) Antitrust Litigation,*
    2010 WL 1286478  (N.D. Cal. 2010) .......................................... 2

*Interstate Circuit, Inc. v. United States,*
    306 U.S. 208 (1939) ................................................................ 5, 12

*Kerr's Catering Service v. Department of Industrial Relations,*
    57 Cal.2d 319 (1962) .................................................................... 9

*Keyes Motors, Inc. v. Div. of Lab. Std. Enforcement,*
    197 Cal.App.3d 557 (1987) ........................................................ 18

*Nassau County Strip Search Cases,*
    461 F.3d 219, (2d Cir. 2006) ....................................................... 6

*Pontius v. Delta Fin. Corp.,*
    2007 WL 1496692 (W.D. Penn. 2007) ........................................ 8

iv

VAN VLECK
TURNER & ZALLER, LLP

## TABLE OF AUTHORITIES

**PAGE**

**CASES:**

Ramirez v. Yosemite Water, Inc.,
    20 Cal.4th 785 (1999) ................................................................ 18

Reiseck v. Universal Communications of Miami,
    591 F.3d 101, (2d Cir. 2010) ............................................... 14, 15

Ruiz v. Affinity Logistics Corporation,
    2009 WL 648973 (S.D. Cal. 2009) ........................................... 6

Sav-On Drug Stores, Inc. v. Superior Court,
    34 Cal.4th 319 (2004) .................................................... 10, 11, 12

Scholtisek v. Eldre Corp.,
    229 F.R.D. 381 (W.D.N.Y 2005) ............................................... 9

Stuart v. RadioShack Corporation,
    641 F.Supp.2d 90, 903 (N.D. Cal. 2009) ................................... 5

Takacs v. A.G. Edwards & Sons, Inc.,
    444 F.Supp.2d 1100 (S.D. Cal. 2006) ................................... 7, 18

Torres v. Gristede's Operating, Co.,
    2006 WL 2819730 (S.D.N.Y 2006) ........................................... 9

United Steel Workers Int'l Union v. Conoco Phillips Company,
    593 F.3d 802 (9th Cir. 2010) ....................................... 2, 10, 14

Valentino v. Carter-Wallace, Inc.,
    97 F.3d 1227 (9th Cir. 1996) ............................................. 2, 10

Vasquez v. Superior Court,
    4 Cal.3d 800 ............................................................................ 6

Ward v. Dixie Nat. Life Ins. Co.,
    595 F.3d 164 (4th Cir. 2010) .................................................. 19

Van Vleck
Turner & Zaller, LLP

Case No. CV 09-6467
PLAINTIFFS' MEMO OF P'S AND A'S ISO
CLASS CERTIFICATION

# TABLE OF AUTHORITIES

PAGE

## CASES:

*White v. Trans Union, LLC,*
    462 F.Supp.2d 1079 (C.D. Cal. 2006) ........................................................ 19

## STATUTES:

IRS Code § 162 ........................................................................................ 5

## REGULATIONS:

29 C.F.R. § 541.201(b)............................................................................ 13

29 CFR § 541.603 .................................................................................... 9

Case No. CV 09-6467
PLAINTIFFS' MEMO OF P'S AND A'S ISO
CLASS CERTIFICATION

# I. **INTRODUCTION**

The parties actually agree on all of the material facts in this case. For example, there is no dispute over the terms of Defendant's written Expense Allowance, its Pay Policy regarding "draws" and "salary," the job duties performed by FAs, or the educational requirements of the position. The parties vigorously disagree, however, as to how the law should apply to these facts. These common legal questions can be decided on cross-motions for summary adjudication, which is infinitely superior to having 2,000 separate trials.

Like any defendant seeking to avoid class-wide scrutiny of its conduct, Morgan Stanley ("MS") seeks to portray the issues as overly complicated, confusing, and "individualized." MS, however, has never shown reluctance to make sweeping, class-wide generalization that worked in its favor. MS was not detained by "individualized" determinations when it categorically denied overtime to all FAs or denied reimbursement allowances to all FAs with insufficient "production." MS's conduct reveals the inequity of its position– i.e., that it may violate the law on a class-wide basis, but the victims must seek redress individually. This is precisely the asymmetry which Rule 23 was enacted to remedy.

MS bears the burden of proving its exemption defenses and negating any element will obviate further inquiry on the subject. Furthermore, Plaintiffs are proceeding under the UCL, which authorizes equitable remedies for any "unfair" business practice that "threatens an incipient violation of [law], or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law."[1]

For all of these reasons, Plaintiffs'· motion for certification should be granted and the Court should set a briefing schedule for summary adjudication on the merits.

---

[1] *Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.,* 20 Cal.4th 163, 187 (1999); *See also* Id. at 180 ("The [UCL] does more than just borrow [unlawful acts].)"

## II. **CLASS CERTIFICATION STANDARDS.**

"[T]o establish their right to class certification, [plaintiffs] need not prove that the common questions are dispositive of the entire litigation as it pertains to each individual." [2]   Rather, "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis."[3]   Furthermore, as the Ninth Circuit recently emphasized in *USW v. Conoco Philips,* a court may not deny certification based on predictions of individual issues that might arise in the future if Plaintiffs' "actual legal theories" are ultimately rejected on the merits.[4]

"Neither the possibility that a plaintiff will be unable to prove his allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining to certify a class which apparently satisfies Rule 23."[5]   Indeed, "a district court retains the flexibility to address problems with a certified class as they arise, including the ability to decertify."[6]   Thus, "when courts are in doubt as to whether certification is warranted, courts tend to favor class certification."[7]   "Even if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular issues."[8]

---

[2] *Brown v. Cameron-Brown Co.,* 92 F.R.D. 32, 46 (D.C. Va. 1981).
[3] *Campbell v. Pricewaterhouse Coopers,* 253 F.R.D. 586, 596 (E.D. Cal 2008), quoting *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1022 (9th Cir. 1998) .
[4] *United Steel Workers Int'l Union v. Conoco Phillips Company,* 593 F.3d 802, 808 (9th Cir. 2010) ("Plaintiffs' basic argument is that the district court abused its discretion by declining certification based on the *possibility* that plaintiffs would not prevail on the merits on their "on duty" theory. We agree.").
[5] *Conoco, supra,* 593 F.3d at 809, quoting *Blackie v. Barrack,* 524 F.2d 891, 901 (9th Cir. 1975).
[6] *Conoco, supra,* 593 F.3d at 809, quoting *Gen. Tel. Co. v Falcon,* 457 U.S. 147, 160 (1982).
[7] *In re TFT-LCD (Flat Panel) Antitrust Litigation,* 2010 WL 1286478 at * 5 (N.D. Cal. 2010).
[8] *Valentino v. Carter-Wallace, Inc.,* 97 F.3d 1227, 1234 (9th Cir. 1996).

VAN VLECK
TURNER & ZALLER, LLP

Case No. CV 09-6467
PLAINTIFFS' REPLY ISO CLASS
CERTIFICATION

In arguing against certification, MS utilizes two main tactics.  The first is to argue that it will prevail on the merits because its policies are legal (according to its favored interpretation of the law, anyway).  The second is to recite tedious laundry lists of irrelevant "differences" between employees (e.g., some specialize in working with "widows," others with "farmers") that have nothing to do with the common issues Plaintiffs are seeking to adjudicate (e.g., whether the FA position "directly involves management policies or general business operations").

Both tactics fail to engage with the real issue before the Court – whether *Plaintiffs' actual theories of recovery* have the potential (if they prevail on the merits) to resolve significant aspects of the substantive class claims.

## III.   WHETHER MS's POLICY UNDER-REIMBURSES EXPENSES.

### A.   PLAINTIFFS' THEORY IS AMENABLE TO CLASS TREATMENT.

MS annually propounded an FA expense reimbursement policy that included a grid which assigned numerical "expense allowances" based on the FAs prior year's production (the "Expense Allowance" policy).  MS admits that no other documents, policies, training, or guidelines were ever communicated to the Branch Level concerning the meaning or proper application of the Expense Allowance policy.[9] The legal sufficiency of this written policy alone is the narrow focus of the action.

Plaintiffs' theory of class-wide liability is simple – the plain language of the "Expense Allowance" policy is calculated to impose caps on reimbursement and MS knew, or should have known, these would result in systematically under-reimbursement of actual expenses.  As one of MS's own declarants explained:

> Q.   Okay.  And do you know if the financial advisor hits that allowance, if they can get reimbursed for more expenses above that allowance?
> A.   No.

---

[9] Plaintiffs' Summary of Evidence at Nos. 1-6.

Q.  No, you don't --
A.  They can't.  They have to stay within that.
Q.  Okay.  And how do you know that?
A.  Because I do the T & E's.[10]

"When a uniformly applied policy is challenged, the validity of the policy predominates over individual issues."[11]  Moreover, "the existence or non-existence of a policy" is an equally appropriate issue for class-wide adjudication.[12]  Plaintiffs claim the Expense Allowance policy is an "unfair business practice" under the UCL and Labor Code.  They seek injunctive relief to change the policy and restitution for past unreimbursed expenses.  This is a proper claim for class certification.

**B.      MS's DEFENSE RAISES NO PREDOMINANT INDIVIDUAL ISSUES.**

    **1.      Isolated Exceptions To An Illegal Policy Do Not Defeat Certification.**

MS's defense is as simple as it is implausible.  It claims the policy authorizes Branch Managers to permit above-allowance reimbursement in exceptional cases, and that the Branch Managers have *sua sponte* used this power to reimburse all "reasonable and necessary" expenses required by California law.

First, a limited ability to deviate from an illegal policy does not cure the policy or insulate it from review.  At most, this partially mitigates some of the damages inflicted by the policy.

Second, this defense can be easily tested with objective class-wide data.  The trier of fact need only compare the reimbursement allowances with the amounts actually reimbursed.  If the allowances have no correlation to the actual reimbursement MS's argument might have "legs."  If the data reveal, however, that the assigned reimbursement allowance effectively sets the upward limit of reimbursement then the allowances are plainly operating as hard "caps."

---

[10]  Plaintiffs' Summary at ¶ 7; Deposition of Sonianne Braithwaite at 57:10-22.
[11]  *Dodge v. County of Orange*, 226 F.R.D. 177, 180 (SD NY 2005).
[12]  *Dodge, supra*, at 181.

1    MS has refused to provide this data and a motion to compel is pending. [13]

2    Nevertheless, as the U.S. Supreme Court has explained, "The production of weak

3    evidence when strong is available can only lead to the conclusion that the strong

4    would have been adverse. Silence then becomes evidence of the most convincing

5    character."[14]  MS's refusal to provide objective data which has the power to prove or

6    disprove its defense – or to cite or discuss that data in its own defense – tells the

7    Court everything it needs to know about what the data will show.

8         **2.      The Correct Interpretation of Section 2802 Is A Common Issue.**

9         MS's policy prohibited FAs from submitting the necessary paperwork to

10   document their expenses.   Thus, it cannot argue that FAs have failed to exhaust this

11   internal process or that MS thereby lacked "knowledge" of the expenses.[15]

12        Moreover, MS own internal policies (the FSA and BIT) deducted specified

13   expense items from FA compensation on a *pre-tax basis* because they were deemed

14   "ordinary and necessary" for the job.  MS now argues, however, that when it said

15   "necessary" it didn't really mean "necessary."  In any event, construing the

16   difference, if any, between "necessary" employee expenses under the IRS Code and

17   "necessary" expenses under Labor Code §2802 is clearly a common legal question.

18        **3.      Damage Calculations Are No Barrier To Certification.**

19        MS's final opposition argument is based on the fallacy that if its Expense

20   Allowance policy it found to violate the UCL or Labor Code must require an

21   individualized review of every unreimbursed expense ever incurred by any class

22   member.  This is obviously incorrect.  Indeed, few aspects of class jurisprudence are

23   more firmly settled than the rule that "that the necessity for an individual

24   determination of damages does not weigh against class certification."[16]  As Courts

25

26   [13] Supplemental Declaration of Brian F. Van Vleck ("Van Vleck Decl.") at ¶¶ 13-15.
     [14] *Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 225-226 (1939).
27   [15] *Stuart v. RadioShack Corporation,* 641 F.Supp.2d 90, 903 (N.D. Cal. 2009).
     [16] *Vasquez v. Superior Court,* 4 Cal.3d 800
28

1  have repeatedly explained:

> There are a number of management tools available to a district court to
> address any individualized damages issues, such as bifurcation, the use
> of a magistrate or special master, alteration of the class definition, the
> creation of subclasses, or even decertification after a finding of
> liability.[17]

For example, in *Estrada v. FedEx,* the California Appellate Court upheld certification of Labor Code § 2802 claims by truck drivers who were misclassified as independent contractors.[18]  In doing so, the reviewing court noted that a judicial determination of "which expenses would be reimbursable" was a common issue favoring certification. [19]  The Court also approved the methodology for establishing eligibility and amounts of damages – i.e., requiring class members to submit "receipts and personal records" to a referee and limiting reimbursement to ten expense items.[20] *Estrada* provides the roadmap for this case.  This Court may also require submission of documentation to a referee and may limit reimbursement to only the eleven categories already acknowledged by MS as "ordinary and necessary" for the FA position.

MS's reliance on *Gattuso v. Harte-Hanks*[21] and *Ruiz v. Affinity Logistics*[22] is misplaced.  In those cases the parties had agreed to reimbursement expenses "through an increase in overall compensation rather than through a separately identified reimbursement payment."[23]   *Gattuso* never addressed class certification. *Ruiz* granted certification on the issue of misclassification but denied certification on damages due to the special need to evaluate "the adequacy of the higher

---

[17] *Nassau County Strip Search Cases,* 461 F.3d 219, (2d Cir. 2006).
[18] *Estrada v. FedEx Ground Package System, Inc.,* 154 Cal.App.4th 1 (2007).
[19] *Estrada, supra,* 154 Cal.App.4th at 13-14.
[20] *Estrada, supra,* 154 Cal.App.4th at 19-20.
[21] *Gattuso v. Harte-Hanks Shoppers, Inc.,* 42 Cal.4th 554 (2007).
[22] *Ruiz v. Affinity Logistics Corporation,* 2009 WL 648973 (S.D. Cal. 2009).
[23] *Gattuso, supra,* 42 Cal.4th at 567-568.

1  compensation" negotiated in each separate contract.[24]

2  MS has never utilized the *Gattuso* method of reimbursing expenses through an

3  "increase in overall compensation." [25]  Unlike in *Ruiz,* there is no need to disentangle

4  individualized contracts or co-mingled expense and compensation accounts.[26]  The

5  proper model for this case is not *Gattuso* or *Ruiz,* but *Estrada v. FedEx.*

6  **IV.   WHETHER FAs WERE PAID ON A "SALARY BASIS."**

7  **A.   THE ADEQUACY OF "RECOVERABLE DRAWS" IS A COMMON**

8     **ISSUE.**

9  It is undisputed that Morgan's pre-2008 pay plan generally advanced

10  "recoverable draws" (i.e., loans) in lieu of a conventional, non-refundable salary.

11  Plaintiffs contend these "recoverable draws" are not "salary" under California law.

12  If Plaintiffs are correct, MS cannot meet the "salary basis" element of the

13  administrative or professional exemptions prior to 2008.  This is a pure legal issue

14  which the Court can decide just once on an "up or down" basis for the entire class. [27]

15  The Southern District reached the same legal conclusion in *Takacs v. AG*

16  *Edwards.*[28]  MS offers no argument against deciding this issue on a class-wide basis.

17  To the contrary, MS invites a class-wide determination by reiterating its contention

18  that the class-wide "Pay Plan Is Lawful."  MS argues that *Takacs* simply

19  misinterpreted the "salary basis" requirement and was wrongly decided.  MS claims

20  the correct result is compelled by a November 11, 2006 DOL Opinion Letter and the

21  district court decision in *Pontius v. Delta Fin. Corp.*[29]  (See Oppo at 14:12-15:5.)

22  _____
[24] *Ruiz, supra,* at *7-8.

23  [25] See Cassero Dep. Exh. BB at 79:23-80:2. ("Q. Do you know:  Did Morgan Stanley consider the expense allowance to be a form of compensation? A. Absolutely not.")

24  [26] Even if MS's Expense Allowance policy were deemed analogous to a "lump sum" reimbursement system – many, if not most, FAs had an allowance of zero.  No individualized

25  inquiry is required to recognize that a cap of "zero" is inadequate.
[27] *See e.g., Bifulco v. The Mortgage Zone, Inc.,* 262 F.R.D. 209, 213 (E.D.N.Y. 2009) (certifying

26  allegations that "defendants failure to pay their loan officers a guaranteed compensation . . . fails to satisfy the salary basis test for exemption.")

27  [28] *Takacs v. A.G. Edwards & Sons, Inc.,* 444 F.Supp.2d 1100 (S.D. Cal. 2006).
[29] *Pontius v. Delta Fin. Corp.,* 2007 WL 1496692 (W.D. Penn. 2007).

28

1    To resolve this state law question the Court must "apply the law as [it]

2  believe[s] the California Supreme Court would apply it."[30]  Plaintiffs believe the

3  *Takacs* definition of "salary" is far more consistent with California law and public

4  policy.  Indeed, the Labor Code is commonly found to offer more protection to

5  employees than the FLSA.[31]  As a result, the reasoning of *Takacs* is even more

6  persuasive as the interpretation of "salary" under the Labor Code.

7    Plaintiffs are not asking to pre-judge this common question of law.  The Court

8  should first certify the class and then proceed to a merits decision on a class-wide

9  basis, presumably through cross-motions for summary adjudication.

10

11  **B.    THE ADEQUACY OF USING COMMISSION DEDUCTIONS TO PAY**

12  **"SALARY" IS A COMMON ISSUE.**

13    The validity of MS's post-2008 pay plan is equally uniform for the entire

14  class.  The issue is whether MS may fund its FAs' monthly "salary" payments by

15  deductions from their commissions.

16    MS claims this practice is accepted under federal law.  But "Federal law

17  provides no analogous provisions to [Labor Code] sections 221-223," which

18  "articulate the principal that [wages] must be paid at the statutory or agreed rate and

19  that no part of this rate may be used as a credit" against separate wage obligations.[32]

20  As a result, Plaintiffs contend that MS's practice of paying salary with offsetting

21  commission deductions violates California's law and precludes MS from claiming

22  these wage payments as "free and clear."  Once again, this is a common question of

23  law which must be decided class-wide.  MS does not argue to the contrary.

24

25  ---
[30] *Astaire v. Best Film & Video Corp.*, 116 F.3d 1297, 1300 (9th Cir. 1997).

26  [31] *Armenta v. Osmos,* 135 Cal.App.4th 314, 323 (2005) (rejecting less general federal "averaging" calculation in minimum wage calculation on basis that California law is  more protective.)

27  [32] *Armenta v. Osmos,* 135 Cal.App.4th 314, 323 (2005) (rejecting less general federal "averaging" calculation in minimum wage calculation on basis that California law is  more protective.)

28

## C.    WHETHER THE SALARY BASIS SURVIVES MS'S WAGE DEDUCTIONS IS A COMMON ISSUE.

MS does not (and cannot) dispute its long-standing policy of making all manner of deductions directly from FA paychecks when their production levels fail to generate a sufficient expense allowance.   Branch Manager Andy Chen, for example, described MS's procedure for deducting FA compensation to pay CSAs: "You fill it out, and you give it to your assistant, your CSA, and she gives it to someone else.  And magically the money goes out of your paycheck at some point in time."[33]  FAs also experience "de facto deductions" by paying for unreimbursed expenses.[34]  The brunt of the deductions is felt primarily by lower performing FAs with no allowance.

The question is whether these deductions trigger the rule that where the "employer has an actual practice of making improper deductions, the exemption is lost during the time period in which the improper deductions were made for employees in the same job classification."[35]  As a matter of law, deciding if deductions negate the salary basis of compensation "is not an individualized inquiry but one based on policy, practice, and conduct."[36]

Thus, whether considered singly or in combination, Plaintiffs' challenges to the "salary basis" exemption element justify class certification under Rule 23.

---

[33] Deposition of Andy Chen, Exh. SS at 89:13-90:13.
[34] *Arriaga, supra*, at 1236 ("there is no legal difference between deducting a cost directly from the worker's wages and shifting a cost, which they could not deduct, for the employee to bear.") accord *Kerr's Catering Service v. Department of Industrial Relations*, 57 Cal.2d 319, 327 (1962) (employees cannot be required to act, directly or indirectly, as "insurers of the employer's business losses.").
[35] 29 CFR § 541.603.
[36] *Torres v. Gristede's Operating Co.*, 2006 WL 2819730 (S.D.N.Y 2006); *Scholtisek v. Eldre Corp.*, 229 F.R.D. 381, 390 (W.D.N.Y 2005); *Ayer v. SGS Control Svcs, Inc.* 2004 WL 2978296 (S.D.N.Y. 2004).

## V.   WHETHER THE FA POSITION IS ON THE "PRODUCTION" SIDE OF THE DICHOTOMY TEST IS A COMMON ISSUE.

### A. THE DICHOTOMY TEST CAN BE APPLIED ON A CLASS BASIS.

Class certification should be granted where "the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment." [37]   One amenable theory is that "perhaps contrary to what defendant expected, classification based on job descriptions alone resulted in widespread de facto misclassification."[38]  Here, Plaintiffs contend that the vast majority of the **undisputed FA job duties** are non-exempt and that the entire position is therefore "squarely" on the "production side" of the dichotomy.

MS is opposing certification based on an affirmative exemption defense which is "narrowly construed."[39]  It is **MS's burden** to prove every necessary element of its exemption defense, including that the FA position principally involves duties "direct related to management policies and general business operations."  Plaintiffs, by contrast, are not required to establish that application of the administrative exemption is "either right as to all members of the class or wrong as to all members of the class."[40]  MS also cannot defeat certification based on vague or speculative conjecture that "individualized" issues might arise if the court were to reject Plaintiffs' legal theories as to the proper characterization of FA job duties. [41]

In the end, however, MS is merely contending that the job duties at issue should be deemed exempt.  As the California Supreme Court explained in *Sav-On*, the parties' competing claims are ripe for class-wide resolution.  Indeed, "whether certain identical work tasks are 'managerial' or 'non-managerial'. . . . is an issue that

---

[37] *Sav-On Drug Stores, Inc. v. Superior Court*, 34 Cal.4th 319, 327 (2004).
[38] Id. at 329.
[39] *Sav-On, supra*, 34 Cal.4th at 338.
[40] Id. at 338.
[41] *Conoco, supra*, 593 F.3d at 809 (9th Cir. 2010).

Van Vleck
Turner & Zaller, LLP

1  can easily be resolved on a class-wide basis by assigning each task to one side of the

2  'ledger.'" [42]

3  **B.    WHETHER PARTICULAR FA DUTIES ARE "DIRECTLY**

4  **RELATED" TO THE MANAGEMENT POLICES AND GENERAL**

5  **BUSINESS OPERATIONS" OF MS ITSELF IS A COMMON ISSUE.**

6        In finding loan brokers are entitled to overtime the DOL recently reiterated

7  that the "production vs. administrative dichotomy is intended to distinguish between

8  work related to the goods and services which constitute the business' marketplace

9  offerings and work which contributes to the running of the business itself." [43]

10       MS even admits that an FA's function is not to run internal operations but to

11  "develop, maintain, and service MS's *client base*." [44]   Indeed, MS policy generally

12  prohibits FAs from engaging in internal management activities for regulatory

13  reasons.

14       3.4.6 Performance of Supervisory Functions

15       Employees who are actively engaged in the management of the Firm's
16       securities business, including supervision, solicitation, conduct of
         business or training of persons who will perform such functions, must
17       take the appropriate supervisory examination.  Other employees will
18       generally not be allowed to take the supervisory examination. [45]

19       MS has also refused to allow Plaintiffs to discover the identities of, or have

20  access to, former FA witnesses who might corroborate their actual job duties without

21  fear of adverse career consequences. [46]   Instead MS has submitted declarations from

22  current FAs who are presumably hand-picked to sign the most favorable statements.

23  These declarations identify a few FA activities that might satisfy the dichotomy test

24

---

25  [42] *Sav-On v. Superior Court,* 34 Cal.4th 319, 330-331 (2004) (emphasis added).
    [43] Administrator's Interpretation No. 2010, at p. 2, quoting *Bothell v. Phase Metrics, Inc.,* 299 F.3d
26  1120, 1127 (9th Cir. 2002); *Davis v. J.P. Morgan Chase & Co.,* 587 F.3d 529, 535 (9th Cir. 2009).
    [44] MS Opposition Brief at 2:8-9 (emphasis added).
27  [45] Global Wealth Management Compliance Manual at § 3.4.6., Exhibit KK.
    [46] Suppl. Van Vleck Decl. at ¶¶ 13-15.

28

1   of "running the business" – these tasks are "assisting in branch management, hiring

2   other FAs, acting as a mentor, training or business development coach, or advising

3   management."[47]   Yet, even among this pool of favorable witnesses MS is forced to

4   admit that only "some" FAs perform these tasks – and those who do spend less than

5   "5-30%" of their time on such internal administration.[48]

6          Despite unfettered access to thousands of FAs, MS has not (and presumably

7   cannot) identify even a single individual FA who actually spends more than 50% of

8   his time engaged in "running the business."  Thus MS's own evidence, especially

9   coupled with its withholding of unbiased witness information in discovery, supports

10  the inference that "misclassification was the rule rather than the exception."[49]

11         MS thus cannot block certification based on speculation that– like Bigfoot or

12  the Loch Ness Monster – one cannot rule out the theoretical existence of an FA who

13  primarily runs the internal operations of the company.

14

15  C.   **WHETHER PARTICULAR FA DUTIES ARE "DIRECTLY**

16       **RELATED" TO THE "MANAGEMENT POLICES AND GENERAL**

17       **BUSINESS OPERATIONS" OF MS'S CUSTOMERS IS A COMMON**

18       **ISSUE.**

19         In a footnote, MS suggests that FAs might, alternatively, be responsible for

20  running the businesses of its <u>clients</u>.  FAs cannot be simultaneously running MS's

21  <u>own</u> internal business operations while also running the internal business operations

22  of clients.   In any event, the DOL has recently explained that "work for an

23  employer's customers does not qualify for the administrative exemption where the

24

---

25  [47] Morgan Stanley's Summary of Evidence at ¶ 20.
    [48] Id.

26  [49] Sav-On, supra, at 330; see also Interstate Circuit, Inc. v. United States, 306 U.S. 208, 225-226

27  (1939) ("The production of weak evidence when strong is available can only lead to the conclusion
    that the strong would have been adverse. Silence then becomes evidence of the most convincing

28  character.") (citations omitted).

Van Vleck
Turner & Zaller, LLP

1  customers are individuals seeking advice for their personal needs."[50]  Rather,

2  qualifying work "includes work in functional areas such as accounting, budgeting,

3  quality, purchasing, advertising, research, human resources, labor relations, and

4  similar areas."[51]  By contrast, the vast majority of clients serviced by FAs are "high

5  net worth individuals" who are seeking appropriate asset allocations for retirement

6  planning and the like.[52]

7  Moreover, even if FAs occasionally provide investment advice to

8  "institutions" (Oppo. at 2:3-4.), their role is still to advise concerning *passive*

9  *securities investments* in stocks, bonds, and other financial products.  FAs do not

10  operate "as consultants on the proper way to conduct a business" such as by

11  "advising businesses how to increase financial productivity or reduce insured risk."[53]

12  Nor do they provide exempt advice concerning "matters that involve policy

13  determinations, i.e., how a business should be run or run more efficiently."[54]

14  MS's Global Wealth Management Division is not a management consulting

15  firm.  It is a "retail" financial advisory firm targeting "high net worth individuals."[55]

16  FAs are registered and authorized only to solicit and trade certain securities, not to

17  provide management or operational business advice.[56]  In fact, MS specifically

18  informs FAs that "The Firm prohibits you from giving legal, tax and accounting

19  advice to a client."[57]  MS's 500+ page FA Compliance Manual addresses every

20  conceivable detail of FA job duties yet never authorizes or even contemplates that

21  FAs may provide business management or operations advice to customers.[58]

22

23  [50] DOL Administrative Interpretation 2010-1, at p. 7.
24  [51] DOL Administrative Interpretation 2010-1, at p. 2, citing 29 C.F.R. § 541.201(b).
    [52] Plaintiffs' Summary of Evidence at ¶¶ 40-50.
    [53] DOL Administrative Interpretation 2010-1, at p. 7.
25  [54] *Campbell v. Pricewaterhouse Coopers*, 253 F.R.D. 586, 598 (E.D. Cal 2008), quoting *Bratt v. County of Los Angeles, supra*, 912 F.2d 1066, 1070 (9th Cir. 1990).
26  [55] Plaintiffs' Summary of Evidence at ¶¶ 40-50.
    [56] Plaintiffs' Summary of Evidence at ¶45.
27  [57] Id. at ¶ 46.
    [58] Id at ¶ 30.
28

VAN VLECK
TURNER & ZALLER, LLP

Finally, the declarations submitted by MS are replete with FAs describing their financial services to various types of individuals.  Yet not one declarant alleges that he spends more than 50% of his time furnishing management or operational advice to active businesses.  Once again, MS cannot block certification based on conjecture – against all evidence -- that some FA might theoretically spend over 50% of his time providing "policy level" business consulting advice concerning general management policies and business operations. [59]

**D.   MS RAISES NO GENUINE INDIVIDUALIZED ISSUES BARRING CERTIFICATION.**

**1.   MS's "Marketplace Offerings" Are a Common Question.**

In *Reiseck v. Universal Communications of Miami*, the Second District also recently emphasized that defining the nature of the employer's business is crucial to any application of the dichotomy.  In that case, the Court found that the position of advertising account executive failed the dichotomy test because "If advertising space is Universal's product and Reiseck's primary duty was the sale of that product, then she may reasonably be considered a sales employee, rather than an administrative employee." [60]  Indeed, the Court found "Universal's sale of advertising space is similar to a financial service company's sale of financial products." [61]

Thus the first step in applying the dichotomy test is to define MS's "marketplace offerings."  Plaintiffs contend these offerings consist of financial planning and brokerage services.  This is a common factual determination for evaluating the administrative exemption defense as to the entire class. [62]

---

[59] *Conoco, supra*, 593 F.3d at 809.
[60] *Reiseck v. Universal Communications of Miami*, 591 F.3d 101, (2d Cir. 2010);
[61] *Id.*
[62] *See e.g., Bell II, supra*, 20 Cal. App. 4th at 825 ("[W]e are concerned only with the business function of the branch claims offices in California where the plaintiffs worked.");

2. **Distinguishing "Sales" From Administrative "Marketing and Promotion" is a Common Issue.**

"[T]he phrase "promoting sales" means actions aimed at increasing sales generally, rather than at making sales to individual customers."[63] For example, the 2nd Cir. offers that "if a bank employee, acting within the scope of her primary duty, encourages a customer to open a money market account while she opens a checking account for that customer, she would not likely be an administrative employee because she simply was selling a financial product."[64]

It is undisputed that FAs do not design MS's financial products. Rather, like the hypothetical banker in *Reiseck,* their business development efforts are focused on obtaining new accounts from individual clients and/or inducing clients to increase the funds in preexisting accounts.

The DOL has recently opined that "Work such as collecting financial information from customers, entering it into the computer program to determine what particular [financial] products might be available to that customer, and explaining the terms of the available options and the pros and cons of each option, so that a sale can be made, constitutes the production work of an employer engaged in selling or brokering [financial] products."[65] If this court agrees with the DOL analysis, then no amount of variation in the different ways that FAs supposedly accomplish these non-exempt "production" tasks can possibly support MS's exemption defense. The DOL also sets forth the following criteria for determining if a position involves non-exempt "sales" rather than administrative "marketing" and "promotion."

➢ "The employee's job description." According to a job description given to applicants, FAs are trained to "Build a client base of high net worth individuals." [66] According to another internal description of the "Financial

---

[63] *Reiseck, supra,* at 108.
[64] *Reiseck, supra, at 108*
[65] Administrator' Interpretation 2010-1, at p. 6.
[66] Financial Advisor – Position Summary, Exh. N; Benner Dep., Exh AA, at 222;21-223:14

Advisor Platform," MS is looking for individuals who have "networking skills" and "no call reluctance" and "Prior successful sales experience [is] desirable."[67]

> "The employer's qualifications for hire."   The FA position requires a "Demonstrated ability to sell" and, while a college degree is preferred, it is "not required for candidates with more than 5 years of sales experience." [68]

> "Sales training." MS's training includes "Prospecting and client acquisition planning skills," and "Consultative selling skills." [69]

> "Method of payment; and proportion of earnings directly attributable to sales."  MS pay its FAs predominantly through sales commissions.  It only grudgingly pays the minimum "salary" it believes it can get away with under state law.   Even the reimbursement of FA business expenses is tied to their level of sales production.

Another class-wide factor weighing against an administrative characterization is MS's assertion that the FAs qualify as overtime-exempt commissioned salespeople.  As "a required element of this exemption" MS necessarily "concedes their primary duty is sales."[70]   Moreover, according to the DOL's analysis, MS's undisputed practice of "evaluat[ing] their performance on the basis of their sales volume" supports a finding that sales is the position's primary duty.[71]

Applying this qualitative administrative/production dichotomy is clearly amenable to class-wide adjudication.  For example, in *Bell II* the Court certified a class of insurance claims adjusters claiming they were entitled to overtime because their position failed the administrative dichotomy test.  The Court was not only able to make this legal characterization on a class-wide basis but was able to do so as a matter of law (in favor of the class) on cross-motions for summary adjudication. [72]

---

[67] Financial Advisor Platform, Exh. O; Benner Dep., Exh. AA, at 217:19-220.
[68] Financial Advisor – Position Summary, Exh. N; Benner Dep., Exh AA, at 222;21-223:14
[69] Financial Advisor Platform, Exh. O; Benner Dep., Exh. AA, at 217:19-220.
[70] Administrator's Interpretation No. 2010-1, p. 6. (Court is hereby requested to take judicial notice of Administrator's. Interpretation attached as Exhibit A.)
[71] Id. at p. 5.
[72] *Bell II, supra,* 20 Cal. App. 4th at 827.

Van Vleck
Turner & Zaller, LLP

Case No. CV 09-6467
PLAINTIFFS' REPLY ISO CLASS
CERTIFICATION

1    The same result should apply here.  Indeed, nothing about Plaintiffs' theory of

2 recovery requires individualized legal or factual determinations.  To the contrary, the

3 only issue is whether the undisputed job duties of the FA position place it squarely

4 on the "production" side of the dichotomy test.

5    **3.    Identifying Duties "Incidental" to Sales is Common.**

6    As the DOL explains in its Administrator's Interpretation, analysis in the

7 service of an individual's own sales efforts is, itself, properly characterized as sales

8 work.  "[I]n determining whether an employee's primary duty is making sales, the

9 work performed incidental to sales should be also be considered sales work." [73]

10 Under this principle, Plaintiffs contend that the "analysis" of data described by MS's

11 declarations is non-exempt because it is incidental to sales – i.e., for the ultimate

12 purpose of facilitating customer transactions with MS.[74]

13

14 **VI.   WHETHER THE FAs WORK IN A PROFESSIONAL OCCUPATION IS**

15      **A COMMON ISSUE**

16    MS claims that "Whether a particular FA qualifies for the professional

17 exemption requires an analysis of the degrees and certifications certifications held by

18 that FA and how the FA uses them in performing the job."  But, as with the

19 administrative exemption, MS fundamentally misconstrues the *qualitative* nature of

20 the inquiry.  Indeed, this identical argument (asserted by the same counsel) was

21 rejected by in the 2008 decision in *Campbell v. Pricewaterhouse Coopers,*[75] which

22 certified a class of accountants for purposes of determining the application of the

23 California professional and administrative exemptions.

24    [T]he [professional exemption] test considers whether an employee is

25    "primarily engaged in an occupation commonly recognized as learned."

26
---
[73] Administrator's Interpretation No. 2010-1, p. 4-5.
27 [74] Id.
[75] *Campbell v. Pricewaterhouse Coopers,* 253 F.R.D. 586 (E.D. Cal 2008).
28

VAN VLECK
TURNER & ZALLER, LLP

In other words, ***the predicate for the learned professional exemption is a qualifying occupation, not a particular individual level of educational attainment***. This inquiry presents a common question because it focuses on whether the individual is employed in a qualifying occupation. [¶] Defendant's interpretation of the learned professional exemption, which focuses on the education and training possessed by each individual employee, cannot be reconciled with the language of the exemption.[76]

The identical analysis and result should apply here and the class should be certified to determine whether the FA position is part of a "qualifying profession."

## VII.   WHETHER THE FA POSITION MEETS ALL REQUIREMENTS OF THE COMMISSIONED SALES EXEMPTION IS A COMMON ISSUE.

MS ignores that it is the party who is asserting the "Commissioned Sales" exemption as an affirmative defense to the payment of overtime.  As the DOL explained in its most recent interpretation, MS's affirmative assertion of a "sales" exemption for the FA position thereby "concedes their primary duty is sales."[77]

MS's opposition also completely ignores another necessary element of the "Commissioned Sales" exemptions -- i.e., its affirmative duty to prove that the FAs are "not making the product or rendering the service" being sold.[78]  This involves analysis similar to the administrative/production dichotomy discussed above.  For example, the Court must first determine the nature of the financial services MS offers to the public (e.g., investment and asset allocation advice) and whether the FAs are directly involved in rendering this service to customers.  This is a class-wide determination involving the fundamental nature and purpose of the position itself.

Indeed, MS appears to tacitly concede the point as it offers no argument in its brief and its proffered declarations are replete with detailed recitations of how FAs

---

[76] *Campbell, supra,* 253 F.R.D. at 598 (emphasis added) (internal punctuation and citations omitted).
[77] DOL Administrator's Interpretation 2010-1, at p. 6; .
[78] *Ramirez v. Yosemite Water, Inc.,* 20 Cal.4th 785, 803-804 (1999), quoting *Keyes Motors, Inc. v. Div. of Lab. Std. Enforcement,* 197 Cal.App.3d 557, 563 (1987); accord *Takacs, supra,* at 1119-20

VAN VLECK
TURNER & ZALLER, LLP

1 directly render financial services to MS customers.

2     Nor is there anything remotely inconsistent in Plaintiffs' position. They

3 contend the FA position is a front-line "production" position in which FAs sell

4 financial advisory services directly to customers and then perform those services

5 themselves. In this respect, FAs are merely a white-collar equivalent to the

6 mechanics in *Keyes Motors,* who sold auto repair services and then performed the

7 services. Like the mechanics in *Keyes,* in the context of MS' FAs are front line

8 "production" employees who are not exempt under either affirmative defense.

9     Finally, MS argues that determining when MS met the required compensation

10 thresholds would involve "individualized issues" that defeat certification. This is

11 obviously wrong.[79] Doing ministerial, arithmetic calculations on a spreadsheet

12 database is not a form of predominant "individualized inquiry."[80]

13 ## VIII.  THE RESTRAINT OF TRADE CLAIMS ARE COMMON

14     The terms of MS's standardized FA Employment Agreement and the

15 acceleration provision of the Bonus/Promissory Note Agreements are undisputed.

16 Plaintiffs' theory of recovery is that these standardized agreements collectively

17 constitute an "unfair" business practice that "threatens an incipient violation of

18 [Business and Profession Code § 16600 or 17200], or violates the policy or spirit of

19 one of those laws because its effects are comparable to or the same as a violation of

20 the law."[81] Plaintiffs have standing to seek injunctive and declaratory relief because

21 they are both subject to the obligations imposed by unfair agreements.[82]

22

23 [79] Suppl. Van Vleck Decl., ¶¶ 8-12.

24 [80] *See e.g., Ward v. Dixie Nat. Life Ins. Co.,* 595 F.3d 164, 180 (4th Cir. 2010) (no individualized issue raised by use of standard "formula" for calculating individual damages); *Brooks v. Educators Mut. Life Ins. Co.,* 206 F.R.D. 96,107 (E.D. Pa. 2002) (certifying insurance under-reimbursement

25 class where plaintiffs could establish liability based on "simple mathematical calculations").

[81] *Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.,* 20 Cal.4th 163, 187 (1999); *See*

26 *also* Id. at 180 ("The [UCL] does more than just borrow [unlawful acts].")

[82] *White v. Trans Union, LLC,* 462 F.Supp.2d 1079, 1083-1084 (C.D. Cal. 2006) (injunctive relief

27 claim requires no loss of money requirement for standing); *Friedman v. 24 Hour Fitness USA, Inc.* 580 F.Supp.2d 985, 994 (C.D. Cal. 2008) (UCL class action may seek only injunctive relief).

28

MS's argues that a side deal among a cartel of brokerage houses to permit inter-member mobility of brokers and clients has "superseded" the integrated employment agreements it requires FAs to execute.  Whether this so-called "Broker Protocol" cures or compounds the anti-competitive effect of MS's agreements is a merits argument which would be premature to address at this stage.


Dated:  April 12, 2010                   VAN VLECK TURNER & ZALLER, LLP


                                         By: _____
                                              Brian F. Van Vleck

**EXHIBIT A**

**U.S. Department of Labor**
Wage and Hour Division
Washington, DC 20210



U.S. Wage and Hour Division

# Administrator's Interpretation No. 2010-1

March 24, 2010

Issued by DEPUTY ADMINISTRATOR NANCY J. LEPPINK

---

SUBJECT: Application of the Administrative Exemption under Section 13(a)(1) of the Fair Labor Standards Act, 29 U.S.C. § 213(a)(1), to Employees who Perform the Typical Job Duties of a Mortgage Loan Officer.

---

Based on the Wage and Hour Division's significant enforcement experience in the application of the administrative exemption, a careful analysis of the applicable statutory and regulatory provisions and a thorough review of the case law that has continued to develop on the exemption, the Administrator is issuing this interpretation to provide needed guidance on this important and frequently litigated area of the law. Based on the following analysis it is the Administrator's interpretation that employees who perform the typical job duties of a mortgage loan officer, as described below, do not qualify as bona fide administrative employees exempt under section 13(a)(1) of the Fair Labor Standards Act, 29 U.S.C. § 213(a)(1).

Typical Job Duties of Mortgage Loan Officers

The financial services industry assigns a variety of job titles to employees who perform the typical job duties of a mortgage loan officer. Those job titles include mortgage loan representative, mortgage loan consultant, and mortgage loan originator. For purposes of this interpretation the job title of mortgage loan officer will be used. However, as the regulations make clear, a job title does not determine whether an employee is exempt. The employee's actual job duties and compensation determine whether the employee is exempt or nonexempt. 29 C.F.R. § 541.2.[1]

Facts found during Wage and Hour Division investigations and the facts set out in the case law establish that the following are typical mortgage loan officer job duties: Mortgage loan officers receive internal leads and contact potential customers or receive contacts from customers generated by direct mail or other marketing activity. Mortgage loan officers collect required financial information from customers they contact or who contact them, including information about income, employment history, assets, investments, home ownership, debts, credit history, prior bankruptcies, judgments, and liens. They also

---

[1] This Administrator's Interpretation applies to employees who spend the majority of their time working inside their employer's place of business, including employees who work in offices located in their homes, rather than mortgage loan officers who are customarily and regularly engaged away from their employer's place of business. It also applies to employees who do not spend the majority of their time engaging in "cold-calling", contacting potential customers who have not in some manner expressed an interest in obtaining information about a mortgage loan. However, because many of the duties of all mortgage loan officers are similar, cases arising in these other contexts are referred to for guidance and cited in this interpretation.

run credit reports.  Mortgage loan officers enter the collected financial information into a computer program that identifies which loan products may be offered to customers based on the financial information provided.  They then assess the loan products identified and discuss with the customers the terms and conditions of particular loans, trying to match the customers' needs with one of the company's loan products.  Mortgage loan officers also compile customer documents for forwarding to an underwriter or loan processor, and may finalize documents for closings.  *See, e.g., Yanni v. Red Brick Mortgage*, 2008 WL 4619772, at *1 (S.D. Ohio 2008); *Pontius v. Delta Financial Corp.*, 2007 WL 1496692, at *2 (W.D. Pa. 2007); *Geer v. Challenge Financial Investors Corp.*, 2007 WL 2010957 (D. Kan. 2007), at *2; *Chao v. First National Lending Corp.*, 516 F. Supp. 2d 895, 904 (N.D. Ohio 2006), *aff'd*, 249 Fed.App. 441 (6th Cir. 2007); *Epps v. Oak Street Mortgage LLC*, 2006 WL 1460273, at *4 (M.D. Fla. 2006); *Rogers v. Savings First Mortgage, LLC*, 362 F. Supp. 2d 624, 627 (D. Md. 2005); *Casas v. Conseco Finance Corp.*, 2002 WL 507059, at *1 (D. Minn. 2002).

Exemptions from minimum wage and overtime requirements under the FLSA "are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit."  *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960).  To fall within the meaning of an "employee employed in a bona fide administrative capacity" an employee's job duties and compensation must meet all of the following tests:

1. The employee must be compensated on a salary or fee basis as defined in the regulations at a rate not less than $455 per week;
2. The employee's primary duty must be the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
3. The employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance.  29 C.F.R. § 541.200.

This interpretation focuses on the application of the second test to employees who perform the typical jobs duties of a mortgage loan officer:

> Whether the primary duty of employees who perform the typical job duties of a mortgage loan officer is office or non-manual work directly related to the management or general business operations of their employer or their employer's customers.

<u>Primary Duty is Work Directly Related to the Management and General Business Operations of the Employer.</u>

An employee's primary duty is "the principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a).  To be exempt, a mortgage loan officer's primary duty must be "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers."  29 C.F.R. § 541.200(a)(2).  In turn, to be work directly related to the management or general business operations of the employer, the work must be "directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."  29 C.F.R. § 541.201(a).  Work directly related to management or general business operations of an employer includes work in functional areas such as accounting, budgeting, quality control, purchasing, advertising, research, human resources, labor relations, and similar areas.  29 C.F.R. § 541.201(b).

2

Thus, the administrative exemption is "limited to those employees whose primary duty relates 'to the administrative as distinguished from the production operations of a business.'" 69 Fed. Reg. 22122, 22141 (April 23, 2004), quoting the 1949 Weiss Report. In other words, "it relates to employees whose work involves servicing the business itself – employees who 'can be described as staff rather than line employees.'" *Id.*, quoting the 1940 Stein Report.

This "production versus administrative" dichotomy is intended to distinguish "between work related to the goods and services which constitute the business' marketplace offerings and work which contributes to 'running the business itself.'" *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1127 (9th Cir. 2002), quoting *Bratt v. County of Los Angeles*, 912 F.2d 1066, 1070 (9th Cir. 1990); *see Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 535 (2nd Cir. 2009) ("[W]e have drawn an important distinction between employees directly producing the good or service that is the primary output of a business and employees performing general administrative work applicable to the running of any business."); *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1230 (5th Cir. 1990) (the dichotomy distinguishes between "those employees whose primary duty is administering the business affairs of the enterprise from those whose primary duty is producing the commodity or commodities, whether goods or services, that the enterprise exists to produce and market"); Wage and Hour Opinion Letter FLSA2005-21 (Aug. 19, 2005) (same). Thus, the dichotomy is "a relevant and useful tool in appropriate cases to identify employees who should be excluded from the exemption." 69 Fed. Reg. at 22141. Moreover, the dichotomy is "determinative if the work 'falls squarely on the production side of the line.'" *Id.*, quoting *Bothell v. Phase Metrics, Inc.*, 299 F.3d at 1127; *see* Wage and Hour Opinion Letter FLSA2006-45 (Dec. 21, 2006) (copy editors working for a marketing firm that promotes the sale of books, who read and correct the firm's marketing promotional materials, fall squarely on the production side of the line and, therefore, are not exempt); Wage and Hour Opinion Letter FLSA2005-21 (Aug. 19, 2005) (background investigators working for a company that contracts with the government to conduct security clearance investigations of potential government employees perform the day-to-day production work of their employer and, therefore, are not exempt).

Work does not qualify as administrative simply because it does not fall squarely on the production side of the line. As the court stated in *Martin v. Indiana Michigan Power Co.*, 381 F.3d 574, 582 (6th Cir. 2004), while production work cannot be administrative, there is no "absolute dichotomy under which all work must either be classified as production or administrative." The court rejected the company's argument that its information technology support specialists were administrative employees because they performed troubleshooting on computers on individual employees' desks and were not directly involved with the nuclear power plant equipment that "produced" electricity. Otherwise, the court asserted, employees such as "the janitorial staff, the security guards, the cooks in the cafeteria, and various other workers" would be viewed as doing administrative work. *Id.*; *see Schaefer v. Indiana Michigan Power Co.*, 358 F.3d 394, 402-03 (6th Cir. 2004) (employee who was primarily responsible for shipments of radioactive materials and waste away from the plant, setting up shipments with the transporter and waste management facility, determining the type of packaging to be used, preparing manifests, inspecting containers, etc., is not engaged in administrative work simply because he is engaged in an activity collateral to the principal business purpose of producing electricity; duties must be related to servicing the business itself to be administrative).

The decision in *Martin v. Cooper Electric Supply Co.*, 940 F.2d 896 (3d Cir. 1991), *cert. denied*, 503 U.S. 936 (1992), in which the Third Circuit evaluated the status of inside salespersons who sold electrical products for their employer, is instructive. The court found that such inside salespersons were production workers who did not qualify for the administrative exemption because the company's primary business purpose was to sell electrical products. The court concluded that the salespersons did not "service" the business simply because they engaged in negotiations and represented the employer in

3

their sales efforts, because such negotiations over the price and other terms of the sale "are 'part and parcel' of the activity of 'producing sales'." *Id*. at 904. Accordingly, any such duties undertaken "in the course of ordinary selling do not constitute administrative-type 'servicing' of Cooper's wholesale business . . . These activities are only routine aspects of sales *production*." *Id*. at 905 (emphasis in original); *see* Wage and Hour Opinion Letter of July 23, 1997, 1997 WL 970727 (although "marketing activity geared to furthering a company's overall sales effort," such as performing public relations or advertising or designing a company's overall sales campaign, is administrative work, engaging in "ordinary day-in-day-out selling activity directed at making specific sales" is not).

The court in *Casas v. Conseco* applied these principles to mortgage loan officers and held that they were "production rather than administrative employees. Conseco's primary business purpose is to design, create and sell home lending products. As loan originators making direct contact with customers, it is plaintiffs' primary duty to sell these lending products on a day-to-day basis." 2002 WL 507059, at *9. The court concluded that the loan officers were unlike the exempt marketing representatives in *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1 (1ˢᵗ Cir. 1997). The representatives in *John Alden* were engaged in more than routine selling efforts focused on particular sales transactions; their marketing efforts were aimed at independent insurance agents and were directed more broadly toward promoting and increasing the company's sales generally. However, because Conseco's loan officers' duties were "selling loans directly to individual customers, one loan at a time," 2002 WL 507059, at *9, the court held that the administrative exemption did not apply. *Accord Wong v. HSBC Mortgage Corp.*, 2008 WL 753889, at *7 (N.D. Cal. 2008) (granting summary judgment to plaintiffs with regard to the administrative exemption because "defendants have not identified any evidence to support a finding that plaintiffs' primary duty is something other than sales"). The preamble to the 2004 Final Rule distinguished between *Casas* and *John Alden* (and other insurance industry cases), emphasizing the difference between employees who have a primary duty of sales and employees who spend the majority of their time on a variety of duties such as promoting the employer's financial products generally, deciding on an advertising budget and techniques, running an office, hiring staff and setting their pay, servicing existing customers (by providing insurance claims service), and advising customers. 69 Fed. Reg. at 22145-46; *see Pontius v. Delta Financial Corp.*, 2007 WL 1496692, at *8 (denying defendant's motion for summary judgment on the administrative exemption, stating that plaintiff's evidence indicated that the loan officers' primary duty is to generate loan sales, rather than assisting in the administrative operations, and that they have duties "flatly distinguishable from those of the insurance industry employees" in the cases discussed in the preamble).

The case law and regulatory distinction between servicing the business and routine sales work requires an examination of whether an employee who performs the typical job duties of a mortgage loan officer has the primary duty of making sales. The regulations implementing the section 13(a)(1) exemption for "outside" sales employees identify some of the factors that should be considered  in determining whether an employee's primary duty is making sales. The regulations state that among the factors to be considered in determining whether an employee has a primary duty of making outside sales are:  the employee's job description; the employer's qualifications for hire; sales training; method of payment; and proportion of earnings directly attributable to sales. 29 C.F.R. § 541.504(b); *see Olivo v. GMAC Mortgage Corp.*, 374 F. Supp. 2d 545, 550 (E.D. Mich. 2004) (relevant factors in evaluating whether an employee has a primary duty of outside sales include whether the employee solicits customers, receives sales training, is compensated by commission, is labeled a salesman, is held to a production standard, and has freedom from supervision); *Belton v. Premium Mortgage, Inc.*, 2006 WL 561489, at *2 (W.D. Mo. 2006) (similar factors).[2]  Moreover, in determining whether an employee's primary duty is making

---

[2] Of course, section 13(a)(1) only exempts "outside" salesmen.

4

sales, the work performed incidental to sales should be also be considered sales work. *See Pontius v. Delta Financial Corp.*, 2007 WL 1496692, at *9 and n.20 (loan officers compile and analyze potential customers' financial data because "doing so is necessary to evaluate the customers' qualifications for a loan, *i.e.*, to make a sale." They are not analyzing the information to provide advice to the customer, which the customer could take and use elsewhere. Rather, the loan officers are performing "*screening* for the benefit of the employer, rather than *servicing* for the benefit of the customer.") (emphasis in original); *see also* 29 C.F.R. § 541.500(b) ("work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall be regarded as exempt outside sales work. Other work that furthers the employee's sales efforts also shall be regarded as exempt work including, for example, writing sales reports, updating or revising the employee's sales or display catalogue, planning itineraries and attending sales conferences").[3]  Applying these factors to the job duties mortgage loan officers typically perform leads to the conclusion that they have a primary duty of making sales.

Further, in addition to the job duties described above, the facts set out in the case law demonstrate that historically mortgage loan officers were often compensated entirely by commissions, and that today many mortgage loan officers  continue to be paid primarily by commissions, sometimes with a base wage, salary, or draw against the commissions.  The commissions are based upon sales that are completed (*i.e.*, loans that actually close), with the commission amount typically based upon the value of the loan.  *See, e.g., Underwood v. NMC Mortgage Corp.*, 2009 WL 1269465, at *1 (D. Kan. 2009) (repayable draw against commissions of $1,400 per month until early 2005; afterwards a minimum salary of $1,000  per month plus commissions); *Henry v. Quicken Loans Inc.*, 2009 WL 596180, at *10 (E.D. Mich. 2009) (minimum base salary plus commissions); *McCaffrey v. Mortgage Sources Corp.*, 2009 WL 2778085, at **2-3 (D. Kan. 2009) (commissions only); *Yanni v. Red Brick Mortgage*, 2008 WL 4619772, at **1-3 (commissions only, based on loans that closed); *Pontius v. Delta Financial Corp.*, 2007 WL 1496692, at *2 (base salary plus commissions, with commissions earned subject to off-set for failure to meet a minimum sales goal in a prior pay period); *Saunders v. Ace Mortgage Funding, Inc.*, 2007 WL 1190985, at **2-3 (D. Minn. 2007) (commissions only until June 2005, with a minimum guarantee treated as a draw against future commissions after that); *Chao v. First National Lending Corp.*, 516 F. Supp. 2d 895, 904-05 (commissions only, based on loans that closed).  Such payment methods support the conclusion that a mortgage loan officer's primary duty is sales.

In addition, employers often train their mortgage loan officers in sales techniques and evaluate their performance on the basis of their sales volume, factors that also are relevant to the analysis of  mortgage loan officers' primary duty.  For example, in *Epps v. Oak Street Mortgage LLC*, 2006 WL 1460273, at *5, loan officers were required to meet a production goal of closing three loans per month, and were evaluated using a form that focused in part on whether they met their sales requirements.  They were required to work on Saturday if they did not meet their sales requirements, and numerous loan officers were disciplined or terminated for failing to meet their sales requirements, as were their managers.  *See Pontius v. Delta Financial Corp.*, 2007 WL 1496692, at *2 (such employees "are hired, trained, earn commissions, and are otherwise successful in their positions, on the basis of their sales performance"); *Belton v. Premium Mortgage, Inc.*, 2006 WL 561489, at *1 (employees "were trained as salespeople in order to learn the mortgage business and to increase their individual sales efforts"); *Casas v. Conseco Finance Corp.*, 2002 WL 507059, at *9 (numerous separation notices showed that their "performance

---

[3] Because work performed incidental to and in conjunction with the employee's own sales or solicitations is considered exempt sales work, the Administrator rejects the September 8, 2006 Wage and Hour Opinion Letter FLSA2006-31's inappropriately narrow definition of sales as including only "customer-specific persuasive sales activity," which is the time that a loan officer spends directly engaged in selling mortgage loan products to customers.

was measured largely according to their sale production"). These factors also support the conclusion that a mortgage loan officer's primary duty is making sales.

Moreover, many employers defending against FLSA lawsuits brought by mortgage loan officers argue that the employees are exempt under section 13(a)(1) as outside sales employees. In these cases, the issue is whether the mortgage loan officers are *outside* salespeople or *inside* salespeople, but the employer concedes their primary duty is sales (a required element of this exemption).[4] Thus, mortgage companies' own defenses are consistent with the conclusion that a loan officer's primary duty is sales.[5]

Finally, courts have repeatedly found that mortgage loan officers who work inside their employer's place of business have a primary duty of sales. *See Chao v. First National Lending Corp.*, 516 F. Supp. 2d at 901 ("[t]here is no question that the primary purpose of loan officers employed by FNL is to make sales or obtain orders or contract for services."); *Barnett v. Washington Mutual Bank*, 2004 WL 1753400, at *7 (N.D. Cal. 2004) (mortgage loan officers working at a nationwide call center "were engaged primarily in selling a product, namely, home mortgages"); *Casas v. Conseco Finance Corp.*, 2002 WL 507059, at *9 ("[a]s loan originators making direct contact with customers, it is plaintiffs' primary duty to sell these lending products on a day-to-day basis."). Indeed, the Administrator is not aware of any court that has found that mortgage loan officers – working either inside or outside – have a primary duty other than sales.

Thus, a careful examination of the law as applied to the mortgage loan officers' duties demonstrates that their primary duty is making sales and, therefore, mortgage loan officers perform the production work of their employers. Work such as collecting financial information from customers, entering it into the computer program to determine what particular loan products might be available to that customer, and explaining the terms of the available options and the pros and cons of each option, so that a sale can be made, constitutes the production work of an employer engaged in selling or brokering mortgage loan products. Such duties do not relate to the internal management or general business operations of the company; they do not involve servicing the business itself by providing advice regarding internal operations, unlike the duties of employees working in, for example, a firm's human resources department, accounting department, or research department. The typical job duties of a mortgage loan officer comprise a financial services business' marketplace offerings, the selling of loan products. Their

---

[4] *See McCaffrey v. Mortgage Sources Corp.*, 2009 WL 2778085, at *4; *In re Wells Fargo Home Mortgage Overtime Pay Litigation*, 527 F. Supp. 2d 1053, 1066 (N.D. Cal. 2007); *Vinole v. Countrywide Home Loans, Inc.*, 246 F.R.D. 637, 640 (S.D. Cal. 2007); *Chao v. First National Lending Corp.*, 516 F. Supp. 2d at 900; *Geer v. Challenge Financial Investors Corp.*, 2005 WL 2648054, at **2-3; *Belton v. Premium Mortgage, Inc.*, 2006 WL 561489, at *1; *Olivo v. GMAC Mortgage Corp.*, 374 F. Supp. 2d at 549-50; *Casas v. Conseco Finance Corp.*, 2002 WL 507059, at **10-11.

[5] Some employers have argued that loan officers are exempt under section 7(i), 29 U.S.C. § 207(i), as commissioned employees of a retail or service establishment who receive more than half their earnings from commissions. In these cases, the primary issue is whether the employer qualifies as a retail or service establishment. *See Underwood v. NMC Mortgage Corp.*, 2009 WL 1269465, at **2-3; *Wong v. HSBC Mortgage Corp.*, 2008 WL 753889, at **7-8; *In re Wells Fargo Home Mortgage Overtime Pay Litigation*, 527 F. Supp. 2d at 1066; *Pontius v. Delta Financial Corp.*, 2007 WL 1496692, at *3; *Vinole v. Countrywide Home Loans, Inc.*, 246 F.R.D. at 640; *Gatto v. Mortgage Specialists of Illinois, Inc.*, 442 F. Supp. 2d at 536-42; *Barnett v. Washington Mutual Bank*, 2004 WL 1753400, at **2-6; *Casas v. Conseco Finance Corp.*, 2002 WL 507059, at **3-5. This defense also is consistent with an employee having a primary duty of sales.

duties involve the day-to-day carrying out of the employer's business and, thus, fall squarely on the production side of the business.

<u>Work Related to the Management or General Business Operations of the Employer's</u>
<u>Customers</u>

The administrative exemption can also apply if the employee's primary duty is directly related to the management or general business operations of the *employer's customers*. "Thus, for example, employees acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consultants, for example) may be exempt." 29 C.F.R. § 541.201(c).

To determine whether a mortgage loan officer's duties are directly related to the management or general business operations of the employer's customers, it is necessary to focus on the identity of the customer. As the preamble to the final rule explained in addressing the provision that advisers and consultants could qualify for the administrative exemption based upon their work for the employer's customers:

> Nothing in the existing or final regulations precludes the exemption because the customer is an individual, rather than a business, as long as the work relates to management or general business operations. As stated by commenter Smith, the exemption does not apply when the individual's 'business' is purely personal, but providing expert advice to a small business owner or a sole proprietor regarding management and general business operations, for example, is an administrative function. . . This provision is meant to place work done for a client or customer on the same footing as work done for the employer directly, regardless of whether the client is a sole proprietor or a Fortune 500 company, as long as the work relates to 'management or general business operations.'

69 Fed. Reg. at 22142.

Thus, work for an employer's customers does not qualify for the administrative exemption where the customers are individuals seeking advice for their personal needs, such as people seeking mortgages for their homes. Individuals acting in a purely personal capacity do not have "management or general business operations" within the meaning of this exemption. However, if the customer is a business seeking advice about, for example, a mortgage to purchase land for a new manufacturing plant, to buy a building for office space, or to acquire a warehouse for storage of finished goods, the advice regarding such decisions might qualify under the administrative exemption.[6] *See Bratt v. County of Los Angeles*, 912 F.2d at 1070 (stating, with regard to employees like stock brokers and insurance claims agents, "[t]o the extent that these employees primarily serve as general financial advisors or as consultants on the proper way to conduct a business, *e.g.*, advising businesses how to increase financial productivity or reduce insured risks, these employees properly would qualify for exemption under this regulation."); *Talbott v. Lakeview Center, Inc.*, 2008 WL 4525012, at *5, n.5 (N.D. Fla. 2008) (in context of firm that provides foster care and child protective services, provision pertaining to the employer's customers is not "relevant because even if Lakeview's foster clients are 'customers,' they do not have 'general business operations.'").[7]

---

[6] Of course the salary test and the test that the primary duty requires the exercise of discretion and independent judgment with respect to matters of significance must also be met.

[7] *See also* Wage and Hour Opinion Letter FLSA2007-7 (Feb. 8, 2007) (case managers working for a service provider for individuals with disabilities are performing the day-to-day production work of their employer and are not "providing administrative services to the employer's customers as contemplated in

7

Based on the above analysis of the typical mortgage loan officer's duties and conclusion that his or her primary duty is making sales for the employer, and because homeowners do not have management or general business operations, a typical mortgage loan officer's primary duty is not related to the management or general business operations of the employer's customers.

Application of 29 C.F.R. § 541.203(b)

Wage and Hour Opinion Letter FLSA2006-31 (Sept. 8, 2006) appears to assume that the example provided in 29 C.F.R. § 541.203(b) creates an alternative standard for the administrative exemption for employees in the financial services industry.  That regulation states:

> Employees in the financial services industry generally meet the duties requirements for the administrative exemption if their duties include work such as collecting and analyzing information regarding the *customer's* income, assets, investments or debts; determining which financial products best meet the *customer's* needs and financial circumstances; advising the *customer* regarding the advantages and disadvantages of different financial products; and marketing, servicing or promoting the employer's financial products. *However, an employee whose primary duty is selling financial products does not qualify for the administrative exemption.*

29 C.F.R. § 541.203(b) (emphasis added).[8]  Contrary to the assumption in Opinion Letter FLSA 2006-31, the administrative exemption is only applicable to employees that meet the requirements set forth in 29 C.F.R. § 541.200.  The regulation at 29 C.F.R. § 541.203(b) merely provides an example to help distinguish between those employees in the financial services industry whose primary duty is related to the management or general operations of the employer's customers and those whose primary duty is selling the employer's financial products.  The fact example at 29 C.F.R. § 541.203(b) is not an alternative test, and its guidance cannot result in it "swallowing" the requirements of 29 C.F.R. § 541.200.

As discussed above, mortgage loan officers typically have the primary duty of making sales on behalf of their employer; as such, their primary duty is not directly related to the management or general business operations of their employer or their employer's customers.  Because of its misleading assumption and selective and narrow analysis, Opinion Letter FLSA2006-31 does not comport with this interpretive guidance and is withdrawn.  Similarly, an Opinion Letter dated February 16, 2001, 2001 WL 1558764, also is withdrawn as inconsistent with this analysis.

Conclusion

---

29 C.F.R. § 541.201(c)"); Wage and Hour Opinion Letter FLSA2005-30 (Aug. 29, 2005) (same); Wage and Hour Opinion Letter FLSA2005-21 (Aug. 19, 2005) (background investigators of private firm that conducts security clearance investigations of potential hires for government agencies could be viewed as performing work related to the management or general business operations of the employer's customers).

[8] The case law and the Department's enforcement experience indicate that the duty listed last, pertaining to general promotion work for the employer, is a minor aspect of a typical loan officer's job.  Moreover, to the extent that such promotion work is performed incidental to and in conjunction with an employee's own sales or solicitations, it is sales work. *See* 29 C.F.R. § 541.503(a).

Based upon a thorough analysis of the relevant factors, the Administrator has determined that mortgage loan officers who perform the typical duties described above have a primary duty of making sales for their employers and, therefore, do not qualify as bona fide administrative employees exempt under section 13(a)(1) of the Fair Labor Standards Act, 29 U.S.C. § 213(a)(1).